880 P.2d 689

Joseph K. BLEDSOE, a single man,
Plaintiff/Appellee/Cross–
Appellant,

v.

SALT RIVER VALLEY WATER USERS'
ASSOCIATION, Defendant/Appel-
lant/Cross–Appellee.

No. 2 CA–CV 93–0237.

Court of Appeals of Arizona,
Division 2, Department B.

Jan. 31, 1994.

Review Denied Sept. 20, 1994.

Hofmann, Salcito & Stevens by Leroy W.
Hofmann and Daniel R. Salcito, Phoenix, for
plaintiff/appellee/cross–appellant.

Jennings, Strouss & Salmon by Michael A.
Beale, James M. Ackerman, J. Matthew
Powell, and Mikel L. Moore and Snell &
Wilmer by George H. Lyons, Phoenix, for
defendant/appellant/cross-appellee.

**OPINION**

DRUKE, Chief Judge.

Salt River Valley Water Users' Association
(SRP) appeals from a jury verdict and judg-

ment in favor of plaintiff Joseph Bledsoe, who was seriously injured while riding his bicycle on SRP's property in the early morning hours of April 5, 1989. Of the four issues SRP raises on appeal, we find that two involving closing and rebuttal argument by Bledsoe's counsel require reversal. Accordingly, because the matter must be retried, we decline to address the issue raised by Bledsoe in his cross-appeal as to the purported delay in the entry of judgment.

## FACTS

SRP delivers irrigation water in the Phoenix area through a system of canals and dozens of "laterals," which are smaller, secondary canals that carry water from the main canals to various delivery points. The banks of the canals and laterals have dirt access roads which SRP's employees use to operate and maintain the irrigation system. The roads are also used by the general public for nonmotorized activities, such as walking, jogging, biking, etc. Motorized use is prevented by gates of various types, including "cable" gates. A cable gate consists of a length of cable stretched across the road between two steel posts. Bledsoe was injured by this type of gate.

At the time Bledsoe was injured, he worked for the Phoenix Fire Department in its health center. His duties included designing and implementing physical fitness programs. To set a fitness example for the other firefighters, Bledsoe decided to ride his bicycle to work. The route he chose was primarily on city streets, but part of it included an SRP lateral road with which he was unfamiliar.

Bledsoe's first ride began before sunrise. It was dark and his bicycle had no headlight. After traveling 16 to 18 miles on city streets, he came to the SRP lateral. Bledsoe saw that the lateral road was blocked by a cable gate, but he was able to pass through a gap at one end of the gate and continue riding. Some distance later, Bledsoe came to a locked ranch gate. He dismounted, picked up his bicycle, carried it around the gate, and resumed riding. Shortly thereafter, he struck a second cable gate, was thrown over the front of his bicycle, and was rendered a quadriplegic. Attached to this second cable gate was a two-foot wide, orange-and-white reflector, which became the primary focus of SRP's defense.

## THE COURTROOM EXPERIMENT

SRP argued to the jury in closing that, based on the testimony of its experts from experiments they conducted under conditions similar to those on the morning of the accident, Bledsoe could have seen the reflector and avoided the cable gate had his bicycle been equipped with a $19.95 headlight. Bledsoe's counsel challenged SRP's position at the close of his rebuttal argument, contending that SRP's experts "never took any pictures of this ... they just told you that this was the case. So let's see." Counsel then requested permission to use the previously admitted reflector and headlight to refute SRP's experts. Specifically, counsel wanted to show that they were wrong in concluding (1) that Bledsoe could have seen the reflector from a distance of 66 feet or more, a safe stopping distance, and (2) that he could have seen the reflector even if the headlight were not shining directly on it because the headlight had a 12–foot cone of light. After SRP's objection was overruled, Bledsoe's counsel proceeded to make the following argument to the jury while shining the headlight on and off the reflector in a partially darkened courtroom at a distance of 40 feet:

Now, that's directly on it. Move it off and what do you see, and I want you to also recognize the fact that a bike is going to be going down a road like this, but where is the 12 foot [cone of light]? Which leads us to the last question, would the light have made a difference?

I submit to you that it would not have made a difference. That's 40 feet. [SRP's experts] are talking about 100 feet. They were talking about 66 feet. They were talking about all sorts of distances that you can see this marvelous cone of light.

This 19.95 marvel that Joe Bledsoe, if he had it on his bike would have avoided the accident. There is no cone of light that's available to Joe if he had it on his bike, if

he was not directly on it and that's why they took all the photographs they took with the lights shined directly on the reflectorized sign.

I think that weighs upon the evidence. Your verdict should clearly be for Joe.

SRP contends that it was error to permit this courtroom experiment because it differed substantially from SRP's own experiments in three respects: the headlight batteries were two years old, the courtroom was only partially darkened, and the jurors' eyes did not have time to adjust to the darkness. Bledsoe counters that these differences affect merely the weight the in-court experiment should be given, not its admissibility, citing *Wagner v. Coronet Hotel*, 10 Ariz.App. 296, 299, 458 P.2d 390, 393 (1969), in which we stated:

> Prior to the reception of evidence based on out-of-court experiments, it must ordinarily be shown that the experiments were conducted under substantially similar conditions to those prevailing during the occurrence in controversy. The conditions need not be identical and *minor* variations in conditions go to the weight rather than the admissibility....

(emphasis added) (citation omitted). Because *Wagner* concerned the admissibility of an expert's testimony about his own out-of-court experiments, it is plainly distinguishable from this case and not controlling. Here, the experiment was conducted by counsel, not an expert, and we believe the variations were major, not minor. *See Ong v. Pacific Finance Corp.*, 70 Ariz. 426, 222 P.2d 801 (1950) (proposed courtroom demonstration in slip-and-fall case would have been reversible error because conditions in courtroom bore no resemblance to conditions where fall occurred); *State v. Buelna*, 25 Ariz.App. 414, 544 P.2d 238 (1975) (request to make tape recording in courtroom to compare with disputed tape properly denied because conditions not shown to be similar to those under which other tape made). *See generally* Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 103 (3d ed. 1991).

Moreover, it is apparent from the circumstances that counsel was attempting to replicate SRP's out-of-court experiments rather than simply trying to illustrate the headlight's traits or characteristics. The distinction is important because replications require a greater degree of similarity than demonstrations.

> When used in an attempted replication of the litigated event, courts generally insist that conditions in the experiment substantially match the circumstances surrounding that event. However, when the experiment is not a purported replication but is more in the nature of a demonstration, it is appropriately admitted if it fairly illustrates a disputed trait or characteristic.

*Volz v. Coleman Co., Inc.*, 155 Ariz. 563, 565, 748 P.2d 1187, 1189 (App.1986), *aff'd on this ground*, 155 Ariz. 567, 748 P.2d 1191 (1987) (citations omitted).

Finally, because the experiment was conducted during counsel's rebuttal argument, the risk of misleading the jury was substantial. As SRP points out, the experiment "would not face cross-examination, explanation by the opposing experts, or even comments of opposing counsel." *See Rayner v. Stauffer Chemical Co.*, 120 Ariz. 328, 585 P.2d 1240 (App.1978) (jury not misled when ample opportunity given to cross-examine expert to establish dissimilarities of tests).

For the foregoing reasons, we hold that the trial court erred in permitting Bledsoe's counsel to conduct the in-court headlight experiment during rebuttal argument under conditions substantially different from the out-of-court experiments SRP's experts conducted.

## COMPUTER SIMULATION OF ACCIDENT

We also hold that the court erred in permitting Bledsoe's counsel to show the jury a videotaped computer simulation (VCS) of the accident during closing argument. Prior to trial, SRP moved in limine to preclude Bledsoe's use of the VCS, arguing that it would be unsupported by the evidence or by the testimony of the computer expert who prepared it because Bledsoe would not be calling him as a witness. Bledsoe countered

that the expert's testimony was unnecessary because the VCS would not be offered in evidence, but used "merely for demonstrative purposes" in Bledsoe's closing argument to show counsel's "version of what happened." The trial court viewed the VCS and reserved its ruling, stating: "I've got to hear what comes in at the trial. I can't sit here and prejudge everything." After the evidentiary phase of the trial, the court ruled as follows:

> [A]s to everything that is depicted in the video tape, [Bledsoe's counsel] could get up and draw it and this is just a more sophisticated way of presenting his theory as to how the accident happened.

> The fact that there's no foundation as [to] how it was prepared is completely immaterial.

We disagree.

The VCS is not, as Bledsoe contends, "the same as a chart or a diagram" drawn by counsel during closing argument. Such charts or diagrams are what one evidence treatise calls pedagogical devices: "Courts have permitted the use of [pedagogical devices] as an aid to the fact-finder in cases involving complicated or voluminous evidence ... [because they] are particularly useful in showing time sequences, tying together much testimony and exhibits to show chronological and personal relationships." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 1006[07] at 1006–15 (1993) (footnote omitted). Having viewed the VCS ourselves, we conclude that it is not a pedagogical device. The VCS depicts a computer expert's opinion of, among other things, how the accident happened, the location of lighted and darkened areas at the time, and the effect of alternate or additional lighting. Bledsoe was thus required to lay the appropriate foundation for those opinions, and SRP was entitled to cross-examine the expert about them. *See generally* Ariz.R.Evid. 702–705, 17 A.R.S.; Udall et al., *supra*, §§ 22–26. Without requiring such foundation and permitting the opportunity for cross-examination, the trial court erroneously "admitted" the VCS under the guise of closing argument.

Bledsoe nevertheless contends that this case is controlled by *Szeliga v. General Motors Corp.*, 728 F.2d 566 (1st Cir.1984) and *Datskow v. Teledyne Continental Motors*, 826 F.Supp. 677 (W.D.N.Y.1993). In *Szeliga*, the jury saw two films showing how an automobile accident had happened, and in *Datskow*, it saw a VCS showing how an aircraft accident had happened. Both cases are inapposite because in both, unlike the case at bar, the experts testified and were subject to cross-examination. In *Szeliga*, the court conducted extensive voir dire on the tests depicted before the films were shown to the jury and the "cross-examination of [the] expert was thorough and comprehensive." 728 F.2d at 568. In *Datskow*, the expert testified "that he had worked with an animator 'to reconstruct a Beechcraft Debonair,' and that 'the purpose of [the VCS] is *to represent what I have reconstructed happened* to this aircraft in the final few moments of flight.'" 826 F.Supp. at 686.

■ Accordingly, we hold that although the evidentiary use of computer simulations is generally permissible, *see Commercial Union Ins. Co. v. Boston Edison Co.*, 412 Mass. 545, 591 N.E.2d 165 (1992), their use is dependent on satisfying the usual foundational requirements for other demonstrative evidence.[1] At a minimum, the proponent must show that the computer simulation fairly and accurately depicts what it represents, whether through the computer expert who prepared it or some other witness who is qualified to so testify, and the opposing party must be afforded an opportunity for cross-examination. In some instances, the proponent may also be required to show that:

> (1) the computer is functioning properly; (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); and (3) the program is generally accepted by the appropriate community of scientists.

*Id.* 591 N.E.2d at 168. In this case, because Bledsoe elected not to satisfy even the mini-

---

1. For purposes of this opinion, demonstrative evidence is broadly defined as evidence that consists of things, e.g., weapons, clothing, photo- graphs, replicas, movies, etc., as distinguished from testimonial evidence about things.

mal foundational requirements for the VCS, the trial court erred in allowing it to be shown to the jury.

## REVERSIBLE ERROR

Bledsoe contends, however, that reversal is not required because the trial court's rulings were not an abuse of discretion or prejudicial to SRP. We disagree.

The trial court has great discretion in conducting a trial. *Hales v. Pittman*, 118 Ariz. 305, 576 P.2d 493 (1978). That discretion will not be disturbed on appeal unless abused. *O'Rielly Motor Co. v. Rich*, 3 Ariz.App. 21, 411 P.2d 194 (1966). Abuse occurs when the discretion is "exercised on untenable grounds, or for untenable reasons." *Torres v. North American Van Lines, Inc.*, 135 Ariz. 35, 40, 658 P.2d 835, 840 (App.1982). That abuse occurred here because, as discussed previously, the trial court's rulings are legally untenable.

Bledsoe nevertheless argues that reversal is not required under the standard of appellate review set forth in *Grant v. Arizona Public Service Co.*, 133 Ariz. 434, 652 P.2d 507 (1982). There, the supreme court listed four factors for determining whether the trial court has abused its discretion. In this case, the first factor is present, that is, "there has been an error of law committed in the process of reaching the discretionary conclusion." *Id.* at 456, 652 P.2d at 529.

The presence of that factor alone, however, does not end our inquiry. We must further determine whether the error influenced the verdict. "Reversal will be required only when there has been error or misconduct and it appears probable that the misconduct 'actually influenced the verdict.'" *Id.* at 454, 652 P.2d at 527, *quoting Sanchez v. Stremel*, 95 Ariz. 392, 395, 391 P.2d 557, 559 (1964). Ordinarily, the determination whether the verdict was so influenced is made initially by the trial court, and when made, will not be reversed on appeal unless clearly erroneous.

The trial court must make a factual determination of whether the misconduct has affected the result; as with most factual determinations, this is a matter within its discretion. We do not reverse that discretionary, factual finding unless the record clearly establishes that the trial court was incorrect.

*Grant*, 133 Ariz. at 455, 652 P.2d at 528. In this case, however, the record is silent regarding such a factual finding by the trial court and, thus, we must determine for ourselves whether its erroneous rulings influenced the verdict. To make that determination, we must decide "whether there is a reasonable probability a different verdict might have been reached if the error[s] had not occurred." *Jones v. Munn*, 140 Ariz. 216, 221, 681 P.2d 368, 373 (1984).

As noted earlier, the crux of SRP's defense was that Bledsoe could have avoided the accident with the use of an inexpensive bicycle headlight. SRP's counsel thus argued to the jury in closing that Bledsoe was totally at fault for his own injuries. The jury, however, only found him 40 percent at fault. We believe that it is reasonably probable that a different verdict might have been reached had Bledsoe's counsel not been allowed to conduct his headlight experiment during rebuttal argument. But for this improper courtroom experiment, SRP's experiments were essentially unchallenged. Bledsoe's experts had conducted no headlight experiments of their own and could not say whether a headlight would have helped or not. Moreover, the courtroom experiment and accompanying argument came at the very end of the case just before the jury retired to deliberate.

We also believe that the jury's verdict might have been influenced by the improper showing of the VCS during Bledsoe's closing argument. A respected evidence treatise comments as follows regarding photographs and videotapes that represent such a staged reproduction of the facts:

Here the extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. For not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit....

2 *McCormick on Evidence* § 214 at 19 (John W. Strong ed., 4th ed. 1992) (footnote omitted). Even Bledsoe's counsel recognized the

persuasive impact of the VCS, explaining to the jury: "The reason why we did this was ... because sometimes just looking at a simple little thing like a tape could make something clear, *even more clear than it already is.*" (Emphasis added.) *McCormick* could not agree more: "Since 'seeing is believing,' and demonstrative evidence appeals directly to the senses of the trier of fact, it is today universally felt that this kind of evidence possesses an immediacy and reality which endow it with particularly persuasive effect." 2 *McCormick on Evidence* § 214 at 3 (footnotes omitted).

For the foregoing reasons, we reverse.

ESPINOSA, P.J., and HATHAWAY, J., concur.