van Gestel, J.
This matter comes before the Court on a motion by the plaintiff, Portland Natural Gas Transmission System (“PNGTS”), seeking summary judgment on all counts against the defendant, Mari-times & Northeast Pipeline, L.L.C. (“Maritimes”).

BACKGROUND

PNGTS and Maritimes are competitors, each engaged in the business of operating interstate natural gas pipelines.
In 1996, Maritimes applied to the Federal Energy Regulatory Commission (“FERC”) for permits to construct a natural gas pipeline between Dracut, Massachusetts, and Wells, Maine, and then between Wells, Maine and the Canadian border. During that same year, PNGTS applied to FERC for a permit to construct a natural gas pipeline between Haverhill, Massachusetts, and North Troy, Vermont.
The Maritimes pipeline system brought natural gas from the Sable Island area off the coast of Nova Scotia through the pipeline of its Canadian affiliate running from Goldboro, Nova Scotia, to St. Stephen, New Brunswick, a town located on the Canada-U.S. border near Baileyville, Maine. The United States portion of the Maritimes pipeline was then to run from Bailey-ville, Maine, through Maine and New Hampshire into Dracut, Massachusetts, where it would connect with segments of the North American pipeline grid.
The PNGTS pipeline was to carry natural gas from the Province of Quebec, Canada, with its start at a connection near North Troy, Vermont, running across Vermont and New Hampshire to a point near West-brook, Maine, where it would then run south through Maine and New Hampshire to a point near Haverhill, Massachusetts.
Since the portion of the Maritimes proposed pipeline from near Westbrook, Maine, to its terminus in Massachusetts was in close proximity to the route proposed by PNGTS in the same area, and mostly for environmental protection reasons, FERC urged PNGTS and Maritimes to enter into a joint venture to construct a single pipeline between Haverhill, Massachusetts, and Westbrook, Maine. According to this arrangement, PNGTS’s and Maritimes’s respective pipelines would share a common pipe and route (the “Joint Facilities”) from Westbrook to Haverhill.
Following the urging of FERC, PNGTS and Mari-times entered into what they call the “Definitive Agreements"-the “Ownership Agreement,” the “Operating Agreement,” and the Engineering and Construction Management Agreement (the “CM Agreement”) — for the purpose of constructing and operating the Joint Facilities.
In each of the Definitive Agreements, PNGTS and Maritimes both agreed “to cooperate with the other, and to take all reasonable steps to construct the . . . Joint Facilities for a November 1, 1998 in-service date.” Problems arose nevertheless. See, e.g., Portland Natural Gas Transmission System et al. v. Maritimes & Northeast, L.L.C., Suffolk Superior Court, No. 99-3546BLS, an earlier lawsuit relating to pipeline construction issues, as yet unresolved, between PNGTS and Maritimes.
The Joint Facilities running from Westbrook, Maine, to Haverhill, Massachusetts, went into service in March 1999. Under Sec. 10.01 of the Ownership Agreement, Maritimes has the capacity to transport approximately 421,860,000 cubic feet of gas per day, or 421,860 “Mcf/d"[2] over the Joint Facilities, and PNGTS currently has the capacity to transport 210,000 Mcf/d thereover.
This lawsuit involves provisions in the Ownership Agreement governing “expansions” to the Joint Facilities. The following sections of the Ownership Agreement are particularly pertinent to the present dispute.
Section 1.23 provides:
“Expansion” shall mean any capital addition to the Joint Facilities, including looping, laterals and/or compression.
Section 11.1 provides in relevant part:
Right of Expansion. Each Party [PNGTS and Mari-times] shall at all times have the right to Expand the Joint Facilities (including subsequent Receipt Points, Delivery Points and laterals) in accordance with this Section 11, provided that if both Owners do not already own an Ownership Interest in such Portion (and the Expansion does not increase the Design Capacity of the existing Portion), each Party shall have a minimum Ownership Interest and Capacity Entitlement Percentage of .000001% in such Portion . . .
Section 11.2 provides:
*135 Notice of Expansion. The Party seeking an Expansion shall notify the other Party in writing, including the proposed Expansion plans and stating the additional Capacity Entitlement requested in the proposed Expansion (which capacity shall be sufficient to meet the needs of the Party requesting the Expansion and still provide a minimum .000001% Ownership Interest and Capacity Entitlement Percentage to the other Party! ) ].
Section 11.3 provides in relevant part:
Response to Notice. Within sixty (60) Days of the Notice described in Section 11.2, the Party notified pursuant to Section 11.2 shall respond indicating whether or not the Party is interested in participating in the proposed Expansion . . .
In accordance with Section 11.2, by letter dated October 11, 2000, Maritimes notified PNGTS and offered PNGTS the opportunity to have an ownership interest in a tap facility that Maritimes was constructing on the mainline of the Joint Facilities in Methuen, Massachusetts, as part of Maritimes’s “Phase III/Hub-Line Project.” The proposed Phase III project consists of a tap facility (i.e., a “T”, a valve and related equipment) on the Joint Facilities in Methuen, Massachusetts, and approximately 25 miles of 30-inch diameter mainline pipe running from Methuen to Beverly, Massachusetts. At Beverly, Massachusetts, the pipeline would connect with a line running offshore from the south in Weymouth, Massachusetts, to the north in Beverly. This latter offshore line is that of Algonquin Gas Transmission Company (“Algonquin”) and has obtained approval from FERC as the HubLine Project. The purpose of the Phase III/HubLine Project is to connect Algonquin’s 1,000-mile pipeline system to the Maritimes system so that Maritimes’s shippers can have direct access to the existing and growing markets connected to the Algonquin system, including the Boston market, and Algonquin’s shippers can have direct access to the new high-pressure source of natural gas through the Maritimes system.
The Phase III Project is estimated by Maritimes to have construction costs of approximately $140 million.
Maritimes offered PNGTS the opportunity to participate in ownership of the tap facility at Methuen because Maritimes considered such a facility to be a Delivery Point as defined in the Ownership Agreement. Maritimes did not, however, offer PNGTS an ownership interest in the 25-mile mainline pipe of Phase III running from the Methuen tap facility to Beverly, Massachusetts. Maritimes does not consider the Phase III mainline pipe to be a “capital addition” to the Joint Facilities and, thus, not an “Expansion” of the Joint Facilities.
PNGTS, on the other hand, considers the entire Maritimes Phase III Project to be a capital addition to the Joint Facilities and, consequently, an Expansion. PNGTS then argues in its Rule 56 motion that Maritimes’s failure to give PNGTS notice and an opportunity for ownership in the mainline pipe from Methuen to Beverly constitutes a breach of the Ownership Agreement.
PNGTS contends that the Court may resolve this dispute simply by interpreting the plain language of the Ownership Agreement.
Maritimes argues that any contract interpretation should favor it, or reveal an ambiguity that needs to be resolved after discovery and a factual hearing.

DISCUSSION

Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party — here PNGTS— bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
This Court intends to adhere strictly to the language of the Ownership Agreement, selected as that language was by sophisticated contracting parties for the purpose of governing their complex relationship.
The interpretation of unambiguous agreements is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). “When the words of the contract are not ambiguous, the contract will be enforced according to its terms.” Mejia v. American Casualty Company, 55 Mass.App.Ct. 461, 465 (2002). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., supra, 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the contracts as a whole, in a reasonable and practical way, consistent with their language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to cariy out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. *136 Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119(1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of written contracts. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In construing the Ownership Agreement in issue here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. Starr, supra, 420 Mass. at 190; Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981).
Here, where PNGTS and Maritimes, sophisticated and knowledgeable entities, chose to embody their agreements regarding the Joint Facilities in detailed and carefully crafted written instruments, they are entitled to and should be held to the contractual language they chose. “It is also elementary that an unambiguous agreement must be enforced according to its terms.” Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). The Court itself must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument modify their expressed statements. “Courts cannot . . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
PNGTS posits a very simple situation in which a reading of the plain language of Section 1.23 of the Ownership Agreement dictates but one result. That Section, quoted above, is repeated here with emphasis added by PNGTS: “Expansion” shall mean “any capital addition to the Joint Facilities, including looping, laterals and/or compression.”
PNGTS then points to Section 13.11(d) of the Ownership Agreement which reads: “The term ‘include’ or ‘including’ shall mean without limitation by reason of enumeration ...”
Next PNGTS turns to the dictionary for a definition of “capital” and proffers: “. . . relating to or being assets that add to the long-term net worth of a corporation <improvements>.” It also suggests a dictionary definition of “addition” that reads: “. . .a part added (as to a building or residential section).”
No more is required, PNGTS argues, for the Court to rule that the Phase III Project, in its entirety, is a capital addition to the Joint Facilities and, therefore, an expansion subject to the notice requirements of Section 11.2 of the Ownership Agreement.
Maritimes, on the other hand, argues that the Ownership Agreement must be read in the context of the transaction it was addressing and the purposes to be accomplished thereby. PNGTS and Maritimes did not come together by choice. They were, and still are, competitors in the complex world of natural gas transmission and sales. Neither of them wanted to build a joint pipeline from Westbrook, Maine, to Haverhill, Massachusetts, and, as case #99-3546BLS, noted above at p. 3, reflects, they are aggressively contesting many aspects of the arrangement regarding the construction and operation of those Joint Facilities.
Maritimes argues that it has individual rights to continue its system south of the terminus of the Joint Facilities at Haverhill, Massachusetts, just as its system runs separately north to New Brunswick, Canada. PNGTS likewise may proceed separately south from Haverhill, as it does running north of Westbrook, Maine, to the Vermont-Quebec border. In short, Maritimes contends that the two competitors have not been forever joined beyond the Haverhill terminus of the Joint Facilities as joint venturers in the natural gas transmission business.
Maritimes contends, in essence, that the words of Section 1.23 that refer to “any capital addition to the Joint Facilities" (emphasis added) cannot be read in the absence of understanding the purpose for and reach of those Joint Facilities. That purpose, Mari-times argues, was to be environmentally sensitive to the adverse consequences of constructing two independent pipelines running nearly parallel from West-brook, Maine, to Haverhill, Massachusetts, and for no other purpose.
Where the wording of a contract is unambiguous, the agreement ought to be enforced according to its terms. See In re Biotech Corp., 186 F.3d 1356 (D.Mass. 1999). A party’s mere claim of ambiguity may not defeat a motion for summary judgment “if the documents do not reflect ambiguity on the point in question, and the party resisting summary judgment adduces no evidence of ambiguity.” US Trust v. Henley & Warren Mgt., Inc., 40 Mass.App.Ct. 337, 343 (1996). Thus, where the language of a contract is clear and unambiguous, extrinsic evidence is inadmissible, and a Court may interpret the meaning of the contract as a matter of law. See ER Holdings, Inc. v. Norton Co., 735 F.Sup. 1094, 1097 (D.Mass. 1990). On the other hand, if the contract language is ambiguous, the interpretation of that language creates a question of fact to be resolved at an evidentiary hearing. See Commercial Union Ins. Co. v. Boston Edison Co., 412 Mass. 545, 557 (1992); see also Trafton v. Custeau, 338 Mass. 305, 307-08 (1959).
The determination of whether a contract is in fact ambiguous is a question of law for the Court. See Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992). A contract’s language is ambiguous where “the phraseology can support reasonable difference(s) of opinion as to the meanings of the words employed.” Coll v. PB Diagnostic Systems. Inc., 50 F.3d 1115, 1122 (1st Cir. 1995). That is the situation here, where the parties have presented the Court with conflicting interpretations of the key contract language. Through its affida *137 vit, Maritimes has provided evidence of ambiguity in the contract language. When read in the context of the purpose for the Joint Facilities, the phraseology can support reasonable differences of opinion. Because the phraseology indicates reasonable differences of opinion as to both the meaning of the words and the intent of the parties, the language is, as a matter of law, ambiguous and must be resolved by a fact finder. Consequently, the contract dispute presented by the parties may not be resolved as a matter of law on the present motion.

ORDER

For the foregoing reasons, the motion of the plaintiff for summary judgment in its favor is DENIED.

By Sec. 1.35 of the Ownership Agreement, “Mcf ’ is stated to mean 1,000 Cubic feet of Gas.