IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

# STATE OF TENNESSEE V. JOHN R. FARNER, JR.

### Direct Appeal from the Criminal Court for Sullivan County
### No. S40,003      R. Jerry Beck, Judge

---

### No. E1999-00491-CCA-R3-CD - Decided June 30, 2000

---

The defendant, John R Farner, Jr., appeals his convictions by a jury for two counts of criminally negligent homicide, two counts of reckless endangerment with a deadly weapon, drag racing, and leaving the scene of an accident involving death or injury for which he received an effective eight-year sentence. The defendant contends that the presentment did not put him on notice that he would be defending against a theory of criminal responsibility, that he is not criminally responsible for the actions of the deceased victims, that the officer was not qualified to testify as an accident reconstruction expert, that the computer-generated videotape of the accident was inadmissible, that the trial court should not have instructed the jury on flight, and that the trial court erred in sentencing. We hold that the presentment sufficiently notified the defendant of the charges and that the defendant was directly responsible for the death of the other driver. We conclude that the defendant was properly held criminally responsible for the death of the passenger and the other victims' injuries, but we merge the two reckless endangerment convictions pursuant to the Double Jeopardy Clause. We hold that the officer was qualified to testify as an expert in accident reconstruction. We hold that the computer-generated videotape illustrating the officer's opinion is inadmissible but that its admission was harmless error. We hold that the evidence supports the instruction on flight and that the length and manner of service of the sentences are proper.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Modified in Part**

TIPTON, J., delivered the opinion of the court, in which WADE, P.J., and OGLE, J., joined.

R. Wayne Culbertson and Richard A. Spivey, Kingsport, Tennessee, for the appellant, John R. Farner, Jr.

Paul G. Summers, Attorney General & Reporter; Patricia C. Kussmann, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Teresa Murray-Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, John R. Farner, Jr., appeals as of right from his convictions by a jury in the Sullivan County Criminal Court of two counts of criminally negligent homicide, a Class E felony; two counts of reckless endangerment with a deadly weapon, a Class E felony; drag racing, a Class B misdemeanor; and leaving the scene of an accident involving death or injury, a Class A misdemeanor. The trial court sentenced the defendant as a Range I, standard offender to consecutive two-year sentences for each of the felonies, to a concurrent six-month sentence for drag racing, and to a concurrent eleven months and twenty-nine days for leaving the scene. The defendant received a three-thousand-dollar fine for each of the felonies and a five-hundred-dollar fine for each of the misdemeanors for a total of thirteen thousand dollars. He contends that :

> (1) the presentment did not give notice that he would be required to defend against a theory of criminal responsibility;

> (2) he is not criminally responsible for the deaths of Landon Baker and Chris Bostrum or for the injuries sustained by Teresa Gilliam and Priscilla Redwine because Mr. Baker's car caused the accident;

> (3) Officer Dale Farmer was not qualified to testify as an expert in accident reconstruction;

> (4) the computer-generated visualization videotape was not admissible because it was based upon information, opinions and assumptions by Officer Farmer and upon information not in the record;

> (5) the trial court should not have instructed the jury on flight based upon the defendant's absence from the accident scene; and

> (6) the trial court erred in sentencing by improperly applying enhancement factors (2) and (6), imposing consecutive sentences, and denying a sentence alternative to confinement.

We affirm the judgments of conviction for the two counts of criminally negligent homicide and the single counts of drag racing and leaving the scene of an accident involving death or injury. We merge the two counts of felony reckless endangerment into a single judgment of conviction and modify the effective sentence accordingly to a total of six-years confinement and ten thousand dollars in fines.

The defendant's convictions arise from a drag race between the defendant's red Camaro Supersport and a white Mitsubishi 3000 GT driven by Landon Baker. Mr. Baker lost control of his Mitsubishi in a curve and collided with Ms. Teresa Gilliam's gold Chrysler Town and Country

Minivan and Ms. Priscilla Redwine's green Volvo. Ms. Gilliam and Ms. Redwine were injured, and Mr. Baker and his passenger, Christopher Bostrum, died as a result of the collision.

At trial, Holly Denell Harris testified as follows: On the evening of March 20, 1997, she was in her Camaro with her sister, Nikki Harris; Mr. Bostrum's sister, Nikki Larkins; and her friend, April Conkin. They had received a page from Mr. Bostrum and drove her Camaro to the Coastal Mart on the corner of Colonial Heights Road and Fort Henry Drive to use the telephone. The defendant and Steven Moore arrived in the defendant's Camaro. She talked to the defendant, whom she had met two weeks earlier, while Mr. Moore was using the telephone at the Coastal Mart. The defendant asked her when they were going to race, to which she replied, "Yeah, right." Mr. Baker and Mr. Bostrum arrived shortly thereafter in Mr. Baker's Mitsubishi and parked beside the defendant. Ms. Harris overheard the defendant ask Mr. Baker when he wanted to "run them." She saw Mr. Baker shake his head from side to side. She said she thought that Mr. Baker was not really paying attention to the defendant. Mr. Bostrum came over and told her that he was going to ride with Mr. Baker to drop off a videotape, and he would meet them at her sister's house.

Ms. Harris testified that Mr. Bostrum went back to Mr. Baker's car and that Mr. Moore had since returned to the defendant's car. She said that she started to leave her parking space but drove back into her spot when the defendant started leaving, revving his engine and squealing his tires. The defendant took the rear exit out of the parking lot onto Colonial Heights Road then stopped and revved his engine. Mr. Baker drove to the front exit leading out of the parking lot onto Colonial Heights Road and waited for the defendant to get to the traffic light at the intersection of Fort Henry Drive. The defendant did not move. Mr. Baker turned onto Colonial Heights Road and stopped at the traffic light. The defendant followed him. Ms. Harris said that she then turned in the opposite direction onto Colonial Heights Road to go home.

Ms. Harris testified that she learned of the accident later that evening. She said that the defendant paged her around 3:00 a.m. and that she asked the defendant if he and Mr. Baker had been racing. She said that he replied, "No, not really" and "He took off and left me before I got to the Texaco." She said that she asked the defendant if he saw the wreck and that he said he only saw objects in the road. She said that he told her that he did not stop because he was too scared and that he had just learned of the deaths.

Tracy Shipley testified that between 9:00 and 10:00 p.m. on March 20, 1997, he was driving toward Kingsport on Fort Henry Drive, a four-lane divided highway. He was traveling in the left lane at forty to forty-five miles per hour, and a Toyota pickup truck was two car-lengths ahead of him in the right lane. As he approached the green light at the intersection with Colonial Heights Road, he saw a white car turn right from Colonial Heights Road into the right lane of Fort Henry Drive. He said that a red Camaro with tinted side windows followed it without stopping for the red light. He said that the Toyota pickup swerved into the left lane to avoid hitting the Camaro. He stated that the two cars went about one hundred feet then accelerated and that he lost sight of them. He said that when he rounded the curve, he saw the cars going across the railroad trestle side by side. He said that he believed that the Camaro was in the left lane and the Mitsubishi in the right

lane. He estimated that the cars were traveling in excess of seventy miles per hour based upon his previous experience in law enforcement. He said that he did not see brake lights on either car.

Mr. Shipley testified that as he turned into the Roadrunner Market, he heard a noise, which he thought was the ladder in the back of his truck. He said he spent only two or three minutes in the Market, buying a pack of cigarettes, then continued down Fort Henry Drive for approximately three minutes. He saw the accident scene once he got to the railroad trestle. He saw a woman lying on the road and a bystander administering first aid. He saw part of the white car against the guardrail and the front of the white car further down the road. He said that he saw a red Camaro coming back toward Johnson City astride the center line. He said someone jumped into the passenger side of the Camaro, which made a U-turn and drove toward Kingsport at high speed. He admitted that he could not say that it was the same red Camaro he saw earlier. He said that he left to call for help, but when he heard sirens, he did not return to the accident site.

J. L. Light testified that between 9:30 and 10:00 p.m. on March 20, 1997, he was at his son's Exxon service station on the corner of Colonial Heights Road and Fort Henry Drive. He said that he heard the sound of someone pulling out louder than normal, which caused him to look out the window. He said he saw a red car and a white car going toward Kingsport.

Elizabeth Reynolds testified that in March 1997, she worked at the Texaco service station and convenience market at the corner of Fort Henry Drive and Moreland Drive. She said that she was at the gas pumps a little before 10:00 p.m. on the evening of the accident when she heard the roar of cars coming from Colonial Heights and headed toward Kingsport. She said she looked up and saw a red car in the left lane and a white car in the right lane. She said that she could not tell what kind of cars they were because they were going too fast. She estimated that they were traveling at one hundred miles per hour or more. She said that she saw the cars go through the traffic light and saw their taillights going around the curve. She stated that she did not see brake lights on either car. She said that she heard a loud boom and called the police.

Kregg Klingman testified that in the late evening of March 20,1997, he and his wife were driving southbound on Fort Henry Drive toward Johnson City. They passed through the Moreland Drive intersection and were just past the Texaco when he heard loud revving engines. He said that he saw two cars, side by side, going toward Kingsport at about eighty miles per hour. He said that he could not tell the make or color of the cars. He said that looking in his rearview mirror, he saw the cars make it through the Moreland Drive intersection and saw their taillights disappear. He did not recall if he saw brake lights on either car.

Tony Bowman testified that between 9:30 and 10:00 p.m. on March 20, 1997, he was driving south in the left lane on Fort Henry Drive toward Johnson City. He said that he was stopped at the traffic light at the intersection of Fort Henry Drive and Moreland Drive, when he heard the revving of engines coming toward Kingsport. He said that he looked up and saw two cars, side by side, traveling at least seventy to seventy-five miles per hour. He said that the car in the left lane was red.

Michael Taylor testified that after 9:00 p.m. on March 20, 1997, he left Wal-Mart and drove south in the left lane of Fort Henry Drive toward Colonial Heights. He said that he planned to turn left at the Moreland Drive intersection but about two hundred feet from the traffic light, he hesitated before entering the turn lane because he saw two cars coming toward him at a high speed. He said

-4-

that the car in the left lane looked like a white Ford Probe and the car in the right lane appeared to be a red Camaro. He said that he veered to the right because he did not know where the cars were going. He said that as the cars passed him, their draft shook his van. He said that he looked in his rearview mirror and saw sparks and brake lights on both cars before they went onto the bridge. He said he thought that they would not make the curve. He said that he had his window down and heard a loud pop. He said that he turned left and dialed 9-1-1 on his cellular telephone.

Mr. Taylor testified that as he pulled up beside a minivan, he saw a woman crawling through the windshield. The woman was on the pavement when he got to her, and he tried to assist her. He saw another car on the side of the road and what was left of the white car, but the red car had gone. He called 9-1-1 again, told them to send more help because others were involved in the accident and advised them to be looking for a red car. He said that he was one-hundred-percent sure that the red car was in the right lane.

Officer Brian Bishop of the Kingsport Police Department testified that shortly before 10:00 p.m. on March 20, 1997, he was parked in a gravel lot at the intersection of Fort Henry Drive and Moreland Drive, talking with two other officers from the Second Judicial Drug Task Force. He said that he heard the sound of cars approaching at high speed from Colonial Heights going toward Kingsport. He said that he could not see the cars because foliage blocked his view. He stated that almost immediately after the cars passed, he heard tires skidding and a very loud collision. He dialed 9-1-1, pulled onto Moreland Drive, and turned onto Fort Henry Drive toward Kingsport to see what had happened. In the southbound lanes, he saw three heavily damaged vehicles: a minivan, a Volvo, and a white Mitsubishi.

Stanley Keith Hodges, a detective with the Sullivan County Sheriff's Office, testified that on March 20, 1997, he was working on the Second Judicial Drug Task Force. He said that he was parked in a dirt lot on Moreland Drive just before the intersection with Fort Henry Drive at 9:45 or 9:50 p.m.. He said that he had his car windows down and that he heard the sound of engines with the RPM's rising, which caused him to look to the intersection. He said that he saw a red car pass through the intersection and that as the car continued out of sight, he heard the RPM's continue to rise. He estimated that the red car was going eighty-five miles per hour. He said that he thought that the cars would have significant trouble making the curve and that a few seconds later, he heard a loud collision. He said that he called Central Dispatch to report a possible accident and followed Officer Bishop to the accident scene. He said as he arrived, a green Volvo was coming to a stop in the emergency lane. He said that he saw the front end of a white car flipped over on Fort Henry Drive with its passenger compartment on the guardrail. He said that he saw a minivan in the road with a female lying nearby. He stated that he and Officer Bishop searched the area for the red car, looking over the guardrail with a flashlight. He said he directed traffic at the accident scene for two hours and did not see the red car. He said that his initial concern was for injured persons and that he did not notice significant traffic congestion until the emergency vehicles arrived. He agreed that it would have been difficult for the red car to return to the scene due to the subsequent congestion but that it would have been able to return within the first five minutes of his arrival.

Teresa Gilliam testified that late on the evening of March 20, 1997, she was returning to

Colonial Heights from the Wal-Mart on Fort Henry Drive in her gold Chrysler Town and Country Minivan. She said that she remembered driving south on Fort Henry Drive toward Hammond Bridge and that she next remembers being in an ambulance. In the accident, Ms. Gilliam broke her left femur, her lower left leg in three places, three toes on her left foot, and her left arm at the elbow; crushed her right femur and right foot; and suffered a gash on her forehead. She spent three weeks in the hospital following the accident and received physical therapy in her home for two months thereafter. At the time of trial, she was still using a crutch and undergoing physical therapy. She reported that her doctor was uncertain about whether her right leg would need further treatment.

Priscilla Abbott Redwine testified that she is a resident of Colonial Heights and a nurse at Holston Valley Hospital. She said that on the evening of March 20, 1997, she was traveling south on Fort Henry Drive toward Colonial Heights in her dark green Volvo. She said that she had crossed Hammond Bridge when something distracted her on the left. She said that the last thing she remembered was seeing what appeared to be a white bullet. She said that her airbag deployed and that she had blood and glass all over her. She said that she noticed an unusual smell and thought that she should get out of the car quickly. She said that she moved into the back seat and slid out the back door, which was partially blocked by the guardrail. She said that she had cuts on her head and left arm, bruising on her arm and leg, glass in her hand, and burns on her face from the airbag. She said that she now has scars on her hand.

Ralph Cline, a detective with the Kingsport Police Department, testified that on March 27, 1997, he was called from home to assist with an accident on Fort Henry Drive. He said that he spent the rest of that night and the early morning of March 21 looking for the defendant, Mr. Moore, and the red Camaro. He said that they were not at either of their parents' homes. He said that he drove around Colonial Heights for two hours but did not find them. He said that he did not know that Mr. Moore called the police station at 1:00 a.m. on the 21st.

Officer Robert Dale Farmer of the Kingsport Police Department testified as an expert in accident reconstruction. He said that on the night of March 20, 1997, he was called to an accident on Fort Henry Drive. He said that 9-1-1 received a call about the accident around 9:50 p.m. and that he arrived around 10:16 p.m. He said that as he approached the railroad bridge, he saw a green Volvo with extensive front-end damage against the guardrail on the southbound shoulder. He said that he saw a gold Chrysler Town and Country Minivan resting crosswise in the southbound lanes facing the guardrail on the southbound shoulder. He said that he saw a white Mitsubishi on the southbound shoulder against the guardrail. He said that the driver, Mr. Baker, and the passenger, Mr. Bostrum, were still in the Mitsubishi when he arrived. He said that Mr. Bostrum was dead but that paramedics were still working with Mr. Baker, who subsequently died.

Officer Farmer testified that he was in charge of the investigation and that he began to search for the cause of the accident. He said that it was 6.5 tenths of a mile from the Coastal Mart parking lot to the point of impact in the accident. He stated that a railroad track runs underneath Fort Henry Drive north of the Moreland Drive intersection and that the accident occurred north of the railroad bridge or trestle. He identified a photograph showing that Fort Henry Drive curves to the left at the railroad bridge. He said that yaw marks on the pavement beginning on the far side of the railroad

bridge show that the Mitsubishi traveled from the right northbound lane of Fort Henry Drive into the southbound lanes, a distance of five hundred and forty-four feet. He said that yaw marks are caused by a car sliding sideways while the wheels continue to rotate forward. He said that the Mitsubishi collided with the minivan in the left southbound lane and that the undercarriage of the minivan caused a gouge mark in the pavement upon impact. Photographs revealed that the minivan sustained front-end damage. Officer Farmer testified that the driver's door could not be opened and the window was broken. He stated that the impact pushed the minivan's dashboard to within six inches of the backrest on the driver's seat and that the steering wheel came to rest six inches from the seat. He said that the minivan's driver, Ms. Gilliam, was already out of the minivan when he got there, and he had determined that she crawled through the driver's window.

Officer Farmer testified that after hitting the minivan, the Mitsubishi became airborne and hit the Volvo. He said that he determined from the white paint on the Volvo and parts of the Mitsubishi's muffler hanging across the Volvo's front bumper that the Mitsubishi initially struck the Volvo with its left rear undercarriage. He said that the Volvo sustained extensive front end damage, that its driver's door could not be opened, and that its hood was up. He said that the Mitsubishi's front wheels and engine compartment split from the rest of the car and came to rest upside down in the left southbound lane. He said that the rest of the Mitsubishi landed on the southbound guardrail behind the Volvo.

Officer Farmer testified that the critical speed of a curve is the maximum speed that a vehicle of any make, model, or year can travel the curve in a particular lane. He said that when a car enters a curve at greater than the critical speed, the centrifugal force keeps the tires in contact with the road, leaving yaw marks. He said that he calculated the critical speed of the right lane of the curve in which the Mitsubishi lost control by first determining the circumference of the circle that contained the yaw marks. He said that in order to calculate the circumference, he first measured the chord, which is a straight line between the two ends of the yaw mark, and then calculated the middle ordinate, which is the distance from the center of the chord to the end of the yaw mark. He used the middle ordinate to calculate the circumference. He said that he also calculated the coefficient of friction or the drag factor of the road with an instrument called a drag sled. He said from this information, he calculated the critical speed of the right northbound lane to be 73.88 miles per hour.

Officer Farmer testified that as a car travels a curve at a speed lower than the critical speed, the rear tires track inside the front tires as the car goes around the curve. He stated that to determine the speed of the Mitsubishi when it first started to yaw, he looked for the crossover, the point at which the rear tires began tracking to the outside of the front tires, and that this was where the car began to rotate. He said that he determined the radius of that point of the yaw. He said that to determine the speed of the center mass of the car, he subtracted half of the track width of the car from the radius. He said that he entered these calculations along with the drag factor into the speed formula. He said that he found that the Mitsubishi was going 95.45 miles per hour when it started to yaw. He stated that he followed the same procedure for the point of impact and determined that the Mitsubishi was going 64.11 miles per hour when it hit the minivan. He said that a true critical speed yaw causes a car to decrease speed. He said that he saw no indication that any of the cars involved had applied their brakes. He said that he gave a copy of his accident report and

-7-

photographs of the area and the accident scene to Professor Neil Owen, who created a computer-generated visualization of the accident.

Officer Farmer testified that on the evening of the accident, he directed officers to look for the defendant, Mr. Moore, and a red Chevrolet Camaro Supersport. He said that the defendant's attorney contacted the police the morning of March 21 and that officers found the defendant, Mr. Moore, and the Camaro at the attorney's office around 5:30 p.m. that day. He said that the Camaro was undamaged.

On cross-examination, Officer Farmer testified that he determined the critical speed for only the right northbound lane on Fort Henry Drive. He said that the critical speed for the left northbound lane would not vary much from that of the right lane, but he admitted that it would be different. He said that no evidence from which he could calculate the critical speed of the left lane existed at the scene. He admitted that he found no skid marks, yaw marks, or red paint from the defendant's car at the scene. He said that the Mitsubishi was out of control for five hundred and forty-four feet. He said that his investigation revealed nothing to indicate that the race between the Mitsubishi and the Camaro was not consensual. He said that he knew that Mr. Moore gave a statement to Officer Ferguson over the telephone and that he got a copy of the statement on the evening after the accident. He admitted that he did not give Mr. Moore's statement to Professor Owen to use in creating the visualization of the accident.

Professor Robert Neal Owen, director of the Advanced Visualization Laboratory at East Tennessee State University, testified as an expert in computer visualization. He described computer visualization as a form of storytelling in which he creates a "copy of reality" with a computer. He said that a visualization is based upon information from an expert whereas a simulation or reconstruction uses the laws of physics to recreate exactly what happened physically. He stated that this was the first visualization of a car accident created by his laboratory. He said that in order to create the videotape, he used information on the vehicles involved, including the speeds at which they were traveling; the physical characteristics of the road such as the size, shape and slope; and the locations of the vehicles after the accident.

Professor Owen testified that he based the depiction of the actions of the Camaro on information from Officer Farmer. He said that Officer Farmer's accident report stated that the Camaro and the Mitsubishi were side by side at the beginning of the railroad bridge. He said that the Camaro had to be in front of the Mitsubishi at the beginning of the videotape in order for it to be beside the Mitsubishi at the railroad bridge because it was going slower than the Mitsubishi as it entered the curve. He said that Officer Farmer told him that the Camaro traveled the curve at or below the critical speed of the curve, which was 73.88 miles per hour. He said that he did not know that Officer Farmer calculated the critical speed for the right lane only, but if the critical speeds for the two lanes varied by only one or two miles per hour, then the difference in speeds would not make any significant difference in the visualization. He admitted that if the difference were fifteen miles per hour, then it would affect the visualization.

The state played the visualization for the jury. The visualization shows the accident from

-8-

five viewpoints: from an overview, the Mitsubishi, the Camaro, the minivan, and the Volvo. Each viewpoint is shown at three speeds: full speed, one-half speed, and one-quarter speed. The visualization shows the accident as follows: the Camaro, which is in the northbound left lane, is traveling in front of the Mitsubishi, which is in the right lane. The Mitsubishi accelerates, pulls beside the Camaro at the start of the railroad bridge, then begins to yaw near the end of the bridge, which causes it to turn sideways facing the southbound guardrail. The Camaro continues through the curve in the left lane and accelerates out of the curve just before the Mitsubishi yaws into the left lane. The Mitsubishi yaws across the northbound left lane into the southbound left lane. The passenger side of the Mitsubishi hits the front of the minivan in the southbound left lane. The Mitsubishi rotates through the air, and the rear of the Mitsubishi hits the Volvo, which is in the southbound right lane. The Camaro continues traveling in the northbound left lane and the accident occurs behind it.

## I. INSUFFICIENT PRESENTMENT

The defendant contends that the presentment did not give him notice that he would have to defend against a theory of criminal responsibility for the deaths of Mr. Baker and Mr. Bostrum and the injuries of Ms. Gilliam and Ms. Redwine. He argues that he defended the case by showing that his car was not involved in the accident and, therefore, that he was not the direct and proximate cause of the deaths and injuries. He claims that the computer visualization implies that the accident resulted in part from Mr. Baker's and Mr. Bostrum's conduct and in part from his conduct because it portrays his car as menacing the minivan and Volvo as it rounded the curve at close to the critical speed. Thus, he contends that the presentment permitted the jury to convict him of the charges without distinguishing between the different causes. The state contends that it was not required to include the theory of criminal responsibility in the presentment.

Count one of the presentment charges in pertinent part that the defendant:

on or about March 20, 1997 . . . did unlawfully, feloniously, knowingly, and recklessly and as the proximate result of the operation of a motor vehicle in a manner creating a substantial risk of death and serious bodily injury, kill Landon D. Baker
. . . .

Count two contains identical language with the exception that the victim is Christopher A. Bostrum, Mr. Baker's passenger. Count three alleges that the defendant:

on or about March 20, 1997 . . . did unlawfully, feloniously, and knowingly, cause serious bodily injury to another, Teresa W. Gilliam, by the display and use of a deadly weapon, to-wit: a motor vehicle . . . .

Count four contains identical language with respect to victim Priscilla A. Redwine.

Criminal responsibility is not a crime but a theory upon which the state may prove a defendant is liable for an offense committed by someone else. State v. Lemacks, 996 S.W.2d 166,

173 (Tenn. 1999). An indictment or presentment charging the defendant with an offense necessarily includes the defendant's criminal responsibility for the offense. Id. Furthermore, Tenn. Code Ann. § 39-11-401[1] puts every defendant on notice that his or her responsibility for another's conduct is covered by an indictment alleging that he or she committed a crime. Thus, the state did not have to charge criminal responsibility in the presentment. See Lemacks, 996 S.W.2d at 173.

The defendant relies upon State v. Barnes, 954 S.W.2d 760 (Tenn. Crim. App.1997), to argue that the state should have charged that it was imputing the conduct of Mr. Baker and Mr. Bostrum to him. In Barnes, the defendant hit, burned, and bit her estranged husband; the husband pinned the defendant to the floor; and the defendant's friend, hearing her cries for help, hit the husband with a baseball bat. The jury convicted the defendant of a single count of aggravated assault based upon her own conduct and that of her friend. A panel of this court acknowledged that the state does not have to include its theory of the defendant's responsibility for the crime in the indictment. Id. at 764. However, the court held that under the specific facts of that case, which involved two assaults by two separate assailants, the indictment charging a single aggravated assault failed to give the defendant notice of which assault the state was attributing to her. Id.

We question whether the limited exception described in Barnes is valid in light of Tenn. Code Ann. § 39-11-401. We note that the pre-1989 statute also provided that aiders and abettors were deemed "principal offenders." Tenn. Code Ann. § 39-1-303 (1982) (repealed 1989). Under the former law, it was well-settled that nothing more need be alleged in a charging instrument against an aider and abettor than is needed for the principal. See, e.g., Calvert v. State, 158 Tenn. 531, 538-39, 14 S.W.2d 735, 738 (1929). Due process notice rights are not violated by such allegations in an aiding and abetting case. State v. Lequire, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981). Furthermore, if a defendant requires more information than that contained in such an indictment, then he or she should seek a bill of particulars. See State v. Hensley, 656 S.W.2d 410, 413 (Tenn. Crim. App. 1983). Nevertheless, this case is factually distinct. Barnes emphasizes that the case involved two assaults to a single victim and the indictment charged only one. Here a single accident

resulted in two deaths and two victims with injuries. The presentment charges two vehicular homicides and two aggravated assaults. The presentment is not ambiguous.

Furthermore, the fact that the jury could have convicted the defendant based upon his criminal responsibility for the actions of Mr. Baker or by finding that he directly caused the accident is of no consequence. In State v. Lemacks, 996 S.W.2d 166 (Tenn. 1999), the indictment charged a single count of DUI arising out of a one-car accident. The defendant's car, which contained the defendant and three friends, plunged into a ditch. The proof conflicted on whether the defendant or

---

[1]Tenn. Code Ann. § 39-11-401 provides:
(a) A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both.
(b) Each party to an offense may be charged with commission of the offense.

another occupant was driving. Both were intoxicated. Our supreme court noted that the defendant could have been convicted for committing the offense himself or due to his criminal responsibility for his friend's commission of the offense. Id. at 168. It held that when "the State seeks to prove one crime arising from one event, we may presume that the jury's general verdict was unanimous" even though the conviction could have been based upon either criminal responsibility or the defendant's own conduct. Id. at 171. This is equally true in the present case in which the presentment charges only a single crime relating to each separate victim. The presentment is sufficient.

## II. CRIMINAL RESPONSIBILITY

The defendant contends that he is not criminally responsible for the deaths of Mr. Baker and Mr. Bostrum or the injuries to Ms. Gilliam and Ms. Redwine because he was not involved in the accident. He also argues that Mr. Baker and Mr. Bostrum as principals did not commit criminally negligent homicide upon themselves and that, therefore, he cannot be criminally responsible for their deaths. The state contends that the defendant is criminally responsible for any other crime committed by the principal offender in pursuit of or as a natural or probable consequence of the crime aided and abetted by the defendant. It argues that the defendant and Mr. Baker were drag racing in concert and that the accident, which resulted in the deaths of Mr. Baker and Mr. Bostrum and the injuries to Ms. Gilliam and Ms. Redwine, was the natural and probable consequence of the drag race.

One is criminally responsible for another's actions if:

(1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
(2) Acting with intent to promote or assist in the commission of the offense, or to benefit in the proceeds or the results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense; or
(3) Having a duty imposed by law or voluntarily undertaken to prevent the commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist in its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402. To be criminally responsible for the acts of another, a defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). In other words, the defendant must "'knowingly, voluntarily and with common intent unite with the principal . . . in the commission of the crime.'" Maxey, 898 S.W.2d at 757 (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). The requisite criminal intent may be inferred from the defendant's "presence, companionship, and conduct before and after the offense . . . ." State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982). A defendant

is also held criminally responsible for any other crime committed by the principal offender in pursuance of the common purpose or as a natural and probable consequence of the crime originally aided and abetted by the defendant.  State v. Carson, 950 S.W.2d 951, 955-56 (Tenn. 1997).

In its order denying the defendant's motion for a new trial, the trial court found:

> The total proof clearly established beyond a reasonable doubt standard that Farner [defendant] and Baker [deceased] were involved in a high speed race just prior to and during the events that brought about the death of the two young men and caused serious bodily injury to two innocent users of a public highway.

(Brackets in original).  It found that the jury properly convicted the defendant for the death of Mr. Bostrum and the injuries to Ms. Gilliam and Ms. Redwine on a theory of his criminal responsibility for the actions of Mr. Baker.  It found that notwithstanding Mr. Baker's status as a co-perpetrator of the drag race, the defendant was criminally responsible for Mr. Baker's death because it was a natural and probable consequence of the drag race.  It also found that the defendant was directly responsible for Mr. Baker's death:

> The killing of Baker had a close relation to the drag race and as a result the killing of Baker could not be considered as just collateral to the drag race.  It was the going out of control by Baker during the drag race between Farner and Baker that resulted in the death of Baker.
> Baker's acts, although contributory to his own death, would not relieve Farner of his own criminal responsibility in the death of Baker.  Drag racing is malum in se and contributory negligence constitutes no defense.

(Citations omitted).

## A.  Criminally Negligent Homicide

One is guilty of criminally negligent homicide if he or she engages in criminally negligent conduct which results in death.  Tenn. Code Ann. 39-13-212(a).  The death of the victim must be the direct and proximate result of the defendant's criminal negligence.  State v. Adam, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995).  Tenn. Code Ann. § 39-11-302(d) defines criminal negligence:

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding the person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The defendant contends that in order for him to be criminally responsible for a criminally negligent

homicide, he must have been aiding or attempting to aid someone who committed a criminally negligent homicide. The principal must be guilty of the crime before an aider and abettor can be found guilty of the crime. Pierce v. State, 130 Tenn. 24, 46, 168 S.W. 851, 856 (1914); Givens v. State, 103 Tenn. 648, 661, 55 S.W. 1107, 1110 (1899); Self v. State, 65 Tenn. 244, 246 (1873); see, e.g., Hudgens v. State, 166 Tenn. 231, 236, 60 S.W.2d 153, 155 (1933).

The proof at trial revealed that the defendant and Mr. Baker were drag racing[2] on a public road. In addition to his involvement in the drag race as a principal, the defendant is also criminally

responsible for any crime that is the natural and probable consequence of Mr. Baker's participation in the drag race. See Carson, 950 S.W.2d at 955 (holding that "an aider and abettor should be criminally responsible for the criminal harms they have naturally, probably and foreseeably put in motion"). No proof exists that Mr. Bostrum, Mr. Baker's passenger, was a participant in the drag race in the sense that he arranged the race, supervised it or set it in motion. See Tenn. Code Ann. § 55-10-501(2). Mr. Baker engaged in criminally negligent conduct, the drag race, which resulted in Mr. Bostrum's death. The defendant is criminally responsible for the criminally negligent homicide of Mr. Bostrum committed by Mr. Baker.

---

[2]Anyone who participates in a drag race on a public highway commits a Class B misdemeanor. Tenn. Code Ann. § 55-10-502. Tenn. Code Ann. § 55-10-501(1) defines drag racing in pertinent part as:

> (C) The use of any one (1) or more motor vehicles for the purpose of comparing the relative speeds of such vehicle or vehicles, or for comparing the relative speeds of such vehicle or vehicles within a certain distance or within a certain time limit;
> (D) The use of (1) or more motor vehicles in an attempt to outgain, outdistance or to arrive at a given destination simultaneous with or prior to that of any other motor vehicle; or
> (E) The use of any motor vehicle for the purpose of the accepting of, or the carrying out of any challenge, made orally, in writing, or otherwise, made or received with reference to the performance abilities of one (1) or more motor vehicles[.]

A participant in a drag race is one who:

> operate[s] any motor vehicle or motor vehicles upon the public highways . . . for the purpose of "drag racing" as herein defined, and also any person or persons who arrange for, supervise, or in any way and manner set in motion any such "drag racing" as herein defined, regardless of whether or not such person or persons may be the operator of, or be a passenger in, any motor vehicle participating in such "drag racing[.]"

Tenn. Code Ann. § 55-10-501(2).

The defendant emphasizes the fact that his Camaro had no contact with any of the vehicles involved in the collision that resulted in the deaths and injuries. Our supreme court has held that a participant in a drag race who is not involved in a collision between another racer and a non-participant remains responsible for the non-participant's death as an aider and abettor. Stallard v. State, 209 Tenn. 13, 17, 348 S.W.2d 489, 490 (1961). In Stallard, Green arranged for Bennett to drag race with Stallard and then rode with Stallard during the race. Stallard's car collided with another car killing a passenger, while Bennett's car had no contact with the accident. Bennett contended that the evidence was insufficient to support his conviction for second degree murder. The court observed that by driving one of the racing cars, "Mr. Bennett directly participated in that unlawful act which resulted in the death of Mrs. Dampier." Id. The court held that Bennett's participation in the race justified his conviction as an aider and abettor despite the fact that he did not collide with the victim. Id. The same is true for the defendant in the present case with respect to Mr. Bostrum's death.

Turning to the defendant's conviction for the criminally negligent homicide of Mr. Baker, the defendant claims that he cannot be convicted based upon his criminal responsibility when the principal has not committed a crime. We believe that the defendant is directly rather than collaterally responsible for Mr. Baker's death because he and Mr. Baker were drag racing in concert, and Mr. Baker's death was a proximate and foreseeable result of the race. Although no Tennessee case addresses the issue of whether a participant in a drag race is criminally liable for a co-participant's death, other jurisdictions have grappled with this question. In Goldring v. State, 654 A.2d 939 (Md. Ct. Spec. App. 1995), the defendant and Hall engaged in a drag race. Hall lost control of his car in a curve and collided with parked vehicles on the opposite side of the road, which resulted in the deaths of Hall and two bystanders. The defendant was convicted of three counts of involuntary manslaughter by a motor vehicle. The court held that the defendant's participation in the drag race "bore a sufficiently direct causal connection" to his co-participant's death to support the conviction. Id. at 944; see State v. Melcher, 487 P.2d 3, 8 (Ariz. Ct. App. 1971) (holding the defendant responsible for the other racer's death because they were jointly engaged in the race and the act of racing was the proximate cause of the death); State v. McFadden, 320 N.W.2d 608, 613, 617 (Iowa 1982) (noting that the requirements of foreseeability and recklessness prevented an unjust result for a defendant convicted of the involuntary manslaughter of another racer); see also State v. Escobar, 633 P.2d 100, 104 (Wash. Ct. App. 1981) (holding that the defendant's racing was the proximate cause of the co-participant's collision and death under Washington's negligent homicide statute which specifies the "driving of any vehicle by any person"). The court reasoned that a co-participant's reckless conduct did not relieve the defendant of his responsibility for his own recklessness. Goldring, 654 A.2d at 944; see McFadden, 320 N.W.2d at 611 (holding that the victim's voluntary and reckless participation in the drag race did not prevent the defendant's conviction for involuntary manslaughter).

In State v. Plaspohl, 157 N.E.2d 579 (Ind. 1959), the defendant's passenger, who had planned and started the drag race, died when the defendant lost control of his car in the race. The trial court directed a verdict for the defendant on the charge of reckless homicide, finding that by actively participating in the race, the victim assumed the risk of his resulting death. The Supreme Court of Indiana held that:

"Contributory negligence is not available as a defense or an excuse in a criminal prosecution; this doctrine has no place in criminal law, and it cannot in any degree purge an act which otherwise constitutes a public offense of its criminal character. Accordingly the contributory negligence of a person injured or killed by the criminal negligence of another does not relieve the latter of criminal responsibility."

Id. at 580 (quoting 22 C.J.S. Criminal Law § 52, at 116-17). The court reasoned that reckless homicide is a crime against the state and that the victim's active participation in the drag race did not bar the defendant's conviction for his crime against the state. Id. at 581.

We note that some jurisdictions have held that the deceased racer's participation in the race supervenes the defendant's participation as the proximate cause of death. Velazquez v. State, 561 So.2d 347, 354 (Fla. Dist. Ct. App. 1990) (holding that the victim killed himself by voluntarily and recklessly participating in the drag race); Thacker v. State, 117 S.E.2d 913, 915 (Ga. Ct. App. 1961) (distinguishing the proximate cause of death from the cause of a condition which presents the opportunity for death by another); State v. Uhler, 402 N.E.2d 556, 559 (Ohio Ct. Com. Pl. 1979) (acquitting the defendant upon determining the deceased racer's actions proximately caused his own death); see Commonwealth v. Root, 170 A.2d 310, 311, 313 (Pa. 1961) (refusing to apply the tort concept of proximate cause to criminal law but noting that even if it were applied, the victim's participation in the race would be a supervening cause of death). These cases emphasize the fact that the defendant and the victim were competitors both assuming the risk of racing and downplay the fact that their joint enterprise was a drag race, which is highly dangerous to both the participants and the public and can foreseeably result in death. See Velazquez, 561 So.2d at 354 (determining that it is unfair to hold the defendant liable when the deceased effectively killed himself); Root, 170 A.2d at 314 (noting that the deceased was aware of the danger created by the defendant's racing but nonetheless chose to attempt to pass the defendant); see also State v. Petersen, 526 P.2d 1008, 1009 (Or. 1974) (adopting the reasoning of the dissenting intermediate appellate judge that public policy opposes placing responsibility for a participant's death on the surviving racer when the survivor's only link to the death is participating in the mutually agreed upon race); State v. Petersen, 522 P.2d 912, 921 (Or. App. 1974) (Schwab, C.J. dissenting) (listing professional racetrack drivers, skydivers, deep sea divers, and even fishermen who put to sea in the face of a predicted storm as examples and

opposing a survivor's manslaughter conviction if all the participants joined in the reckless conduct knowingly and voluntarily).

We believe that the better reasoned result is to hold those who drag race in concert directly responsible for the proximate and foreseeable results of the drag race. Our statute defining drag racing clearly contemplates sanctioning participants acting in concert because it specifies the "use of one (1) or more motor vehicles" and the "performance abilities of one (1) or more motor vehicles[.]" Tenn. Code Ann. § 55-10-501(1)(C), (D), (E). Furthermore, this court has held the crime of drag racing to be malum in se. Cole v. State, 512 S.W.2d 598, 602 (Tenn. Crim. App. 1974). Mr. Baker's participation in the drag race does not relieve the defendant of his liability for his participation in the offense. Thus, the defendant should face the consequences stemming from his own participation in the drag race.

In this case, Holly Harris testified that while they were at the Coastal Market, the defendant asked Mr. Baker when they would "run" their cars. Witnesses saw the defendant's Camaro and Mr. Baker's Mitsubishi travel north on Fort Henry Drive side by side at a high rate of speed. Tracy Shipley saw the two cars together on the railroad bridge which precedes the curve. The yaw marks on the road revealed that Mr. Baker lost control of his vehicle as he entered the curve. Mr. Baker died from the injuries he sustained when his car collided with a minivan and a Volvo. The proof supports the trial court's finding that the defendant and Mr. Baker were drag racing in concert, and Mr. Baker's death was proximately caused by the drag race.

The defendant also contends that he, Mr. Baker, and Mr. Bostrum were co-perpetrators in the drag race. He analogizes his case to that of State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988), in which this court held that the defendant could not be convicted of felony murder for the death of the co-perpetrator at the hands of the robbery victim because the death was not in furtherance of the felony. He maintains that the deaths of Mr. Baker and Mr. Bostrum were not in furtherance of the crime of drag racing but in direct contravention of the purpose of the race. In Severs, we held that "to sustain a conviction of first-degree felony-murder, the killing must have been in pursuance of, rather than collateral to," the underlying felony. Id. "In pursuance of" or "in furtherance of" necessarily indicates result oriented behavior. An analysis of whether Mr. Baker's and Mr. Bostrum's deaths were "in furtherance of" the drag race is completely unrelated to the crime of criminally negligent homicide, in which the perpetrator acts negligently rather than intends a result. This issue is without merit.

**B. Reckless Endangerment**

The defendant also contends that he is not criminally responsible for the injuries to Ms. Gilliam and Ms. Redwine, which resulted in his reckless endangerment convictions, because his car had no contact with the accident. As discussed above, Stallard holds to the contrary. 209 Tenn. at 17, 348 S.W.2d at 490. Furthermore, the defendant's own actions in participating in the drag race recklessly endangered Ms. Gilliam and Ms. Redwine. Reckless endangerment is defined as recklessly engaging "in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). Reckless endangerment with a deadly weapon is a Class E felony. Tenn. Code Ann. § 39-13-103(b). The defendant drove his Camaro on a public road at a speed estimated to be between seventy and one hundred miles per hour. The speed limit on this road is forty-five miles per hour. The proof reveals that a number of people were traveling on Fort Henry Drive at the time of the drag race. The jury properly found the defendant guilty of reckless endangerment.

Although the defendant's brief did not challenge the fact that he received two reckless endangerment convictions arising out of one episode of driving, we believe that his convictions for two counts of reckless endangerment constitute plain error under the circumstances of this case. See Tenn. R. Crim. P. 52(b). In State v. Ramsey, we held that the statute defining reckless endangerment prohibits a course of conduct as opposed to an individual act or result and, therefore, that a single period of reckless driving typically constitutes a single offense even though the driver endangered more than one person. 903 S.W.2d 709, 713 (Tenn. Crim. App. 1995). In Ramsey, the defendant

-16-

was speeding, swerved into the opposite lane in front of the Tripletts' pickup truck, which contained four people. The defendant swerved back into his own lane, swerved into the opposite lane again, and collided with Mr. Story's pickup truck, causing him to suffer bruising and soreness. We observed:

> The evidence indicates that the defendant's loss of control of his vehicle, combined with the speed at which he was driving, were responsible for both his swerving in front of the Tripletts and hitting the Story vehicle. Due to the very short distance between the two trucks and the very short amount of time that passed between swerving into the oncoming lane of traffic in front of the Tripletts and the crash with Mr. Story, the reckless conduct engaged in by the defendant was one continuous act, a single course of conduct, and therefore supports only one conviction for that act.

Id. Although here Mr. Baker's Mitsubishi struck both the minivan and the Volvo and both Ms. Gilliam and Ms. Redwine received injuries, Mr. Baker encountered both vehicles within a very short time and distance once he lost control of his car. We note that Ramsey did not create a "blanket rule that provides that a defendant's continuous operation of a vehicle may only result in one act of reckless endangerment under the statute." Id. (emphasis in original). Nevertheless, we believe that this case is sufficiently similar to Ramsey to warrant the same result. Therefore, we hold that the dual convictions violate the Double Jeopardy Clause and that the finding of guilt for the reckless endangerment of Ms. Redwine, count four, merges into the conviction for the reckless endangerment of Ms. Gilliam, count three. The judgment of conviction for count four is vacated.

### III. EXPERT WITNESS

The defendant contends that Officer Dale Farmer was not qualified to testify as an expert in accident reconstruction and that he was prejudiced by Officer Farmer's testimony. He argues that Officer Farmer did not have the knowledge of science and engineering needed to provide helpful or trustworthy expert testimony in the field of accident reconstruction. He also claims that Officer Farmer did not explain the underlying scientific basis for the formula he used to calculate speed. The state contends that Officer Farmer has specialized skill, knowledge and expertise gained through his training in accident reconstruction, which qualifies him to give expert testimony in this area.

Regarding his qualifications as an expert in accident reconstruction, Officer Farmer testified that he had worked as a patrolman for the Kingsport Police Department (KPD) for seven years. He said that before joining the KPD, he had been a Hawkins County Sheriff's Department deputy for four or five years and an officer in the Church Hill Police Department for five years. He said that he had been an accident reconstructionist for almost two years and had testified as an expert in City Court and Sullivan County General Sessions Court. He said that he had investigated approximately fifty traffic fatalities and performed a full reconstruction on twenty to twenty-five of those.

Officer Farmer testified that his training in accident reconstruction consisted of three eighty-hour courses in Johnson City, Tennessee on basic accident investigation, advanced accident

investigation, and accident reconstruction and a forty-five-hour DUI and vehicular homicide course in Nashville, Tennessee. He stated that he also attended training courses on DUI, interviewing and interrogation, evidence, and railroad grade crossing and commercial vehicle accident investigation. He said that the Police Officer Standards and Training (POST) Commission in Nashville certified him to teach the basic accident school. He said that he had instructed eight officers in accident investigation, which includes reconstruction.

Officer Farmer testified that as an accident reconstructionist, he was trained to inspect vehicles involved in an accident and to determine the speeds of the vehicles, their position on the road, the direction in which they were traveling, the position of the occupants, whether the head and taillights were in use, and whether mechanical or human error contributed to the accident. He said that he determines the point of impact in the accident by examining debris and fluids from the vehicles, the end of or an angle in the skid marks, scrape or gouge marks on the road, and eyewitness accounts. He said that he determines how the vehicles collided by looking at the evidence from the road, the angles of impact on the vehicles, the positions of the vehicles, the direction in which the vehicles were traveling, and which vehicle had the right of way.

Officer Farmer testified that one way to determine a vehicle's speed was by using a critical speed yaw. He said that in making this calculation, he first determines the circumference of the circle containing the yaw mark by measuring a chord, which is the distance of a straight line between the ends of the yaw mark. He then takes the middle ordinate, which is the distance from the center of the chord to one end. He uses these measurements to arrive at the radius of the circle. He said he adjusts the radius with the center mass of the vehicle by subtracting one-half of the vehicle's track width. He said that he uses a drag sled to find the coefficient of friction or the drag factor of the road. He said that he then puts the adjusted radius and the drag factor into the speed formula to get the vehicle's speed. He testified that as a part of his training, he calculated the speed of test cars based upon the physical markings on the road and then checked his results against radar measurements of the actual speed of the test car. He stated that the speed formula he uses is from the Institute of Police Technology in Florida, appears in many accident reconstruction training manuals, and is in common use throughout the United States.

On cross-examination, Officer Farmer testified that he was a high school graduate and had some college credits. He stated that he did not take a physics course in high school and that he studied geometry as part of his general mathematics class. He agreed that the scientific analysis performed by reconstructionist was complicated and required a good knowledge of physics. He stated that in his accident investigation courses, he learned how Newton's Laws applied to the mathematics and physics of a collision. He admitted that he had no training in metallurgy.

The trial court found that Officer Farmer's testimony was relevant to the speed of the cars, that he possessed a specialized knowledge, and that his testimony would substantially assist the jury in determining the facts at issue in this case. It further found that Officer Farmer had sufficient knowledge, background, skill, experience and training to testify in the field of accident reconstruction. The court found that the probative value of Officer Farmer's testimony would substantially outweigh any potential prejudice to the defendant. Over the defendant's objection, the

trial court allowed Officer Farmer to testify as an expert in the field of accident reconstruction.

Whether a witness is qualified to testify as an expert is governed by Rule 702, Tenn. R. Evid.:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

"To give expert testimony, one must be particularly skilled, learned or experienced in a science, art, trade, business, profession or vocation, a thorough knowledge of which is not within the scope of the common knowledge and experience of the average person." Kinley v. Tennessee State Mut. Ins. Co., 620 S.W.2d 79, 81 (Tenn. 1981). The witness may gain expertise through formal education or through life experiences. Neil P. Cohen et al., Tennessee Law of Evidence § 702.3, at 460 (3rd ed. 1995). The decision to admit expert testimony is reserved to the discretion of the trial court and will not be disturbed on appeal absent an abuse of such discretion. State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). In fact, the defendant will only gain relief on appeal for an abuse of discretion that was prejudicial. State v. Tizard, 897 S.W.2d 732, 748 (Tenn. Crim. App. 1994).

The defendant challenges the officer's qualifications generally arguing that he did not have the educational background needed to give helpful or trustworthy testimony in accident reconstruction. To support his contention, the defendant relies upon Johnson v. Attkisson, 722 S.W.2d 390 (Tenn. Ct. App. 1986). In Johnson, the officer had attended training courses on accident reconstruction, investigated numerous accidents, and previously testified as an expert in the field. Nevertheless, the appellate court held that the trial court should not have permitted the officer to testify about the speed of the defendant's truck just before the accident because he failed to show that his training taught him to estimate speed based upon the skid marks at the accident scene. Id. at 392. This is not the case here as Officer Farmer testified that his training in accident reconstruction included instruction on calculating speed. The Johnson court also held that the officer had failed to testify about the facts upon which his opinion regarding the truck's speed was based, such as the weight of the vehicle, the tire type or air pressure, and the type and condition of the road's surface. Id. We note that this is also not the case here as Officer Farmer testified about the various factors that went into the speed calculation such as the drag factor of the road and the radius of the yaw mark. We believe that the trial court did not abuse its discretion in finding Officer Farmer qualified to testify generally as an accident reconstruction expert.

However, we note that an individual's qualification to testify as an expert in a certain field does not give him or her leave to testify to the results of a scientific test without establishing the reliability of the underlying test. In this regard, the defendant now seeks to challenge Officer Farmer's expertise for determining speed, arguing that although Officer Farmer explained how he obtained the numbers that he applied to the speed formula, he did not explain the scientific basis for the formula itself. In the context of breath tests revealing blood alcohol content pre-State v. Sensing,

843 S.W.2d 412 (Tenn. 1992), our supreme court held that in order for a witness to testify about the results of a scientific test, the witness must be able to explain the scientific theory underlying the test:

> To trust to the procedure of simply following instructions and getting a correct reading without any understanding of the theory that makes the reading accurate would be to approve pure hearsay evidence of intoxication.
> It is our conclusion, then, that even though the person who operates the testing device may be shown to know adequately the steps in handling the machine, he must further have knowledge of the reasons for such operation and the scientific principle that reflects the results as an accurate reading of blood alcohol content.

Pruitt v. State, 216 Tenn. 686, 695, 393 S.W.2d 747, 752 (1965) (citations omitted); Fortune v. State, 197 Tenn. 691, 700, 277 S.W.2d 381, 385 (1955).[3]  Similarly, an expert witness is not qualified to give an opinion about the speed of a car based upon physical markings left at the accident scene if he or she has no familiarity with the theory behind the formula used to calculate the speed.  See Walters v. Glidwell, 572 S.W.2d 657, 658-59 (Tenn. Ct. App. 1978) (holding that an officer who merely plugged his measurements of skid marks into a template and arrived at a speed but knew nothing of the theory or mathematics behind the template was not an expert); State v. Jerome D. Upman, No. 03C01-9402-CR-00052, Hamblen County, slip op. at 8 (Tenn. Crim. App Aug. 2, 1994) (holding that the trooper properly testified as an accident reconstruction expert because he "testified to his familiarity with the applicable mathematical equations, his background and training in those equations, and their use in ascertaining the estimated speed of this defendant's vehicle"); State v. Carol H. Dougherty, No. 827, Sullivan County (Tenn. Crim. App. Jan. 9, 1989) (determining no abuse of discretion in permitting the expert testimony of a trooper who adequately explained the scientific theories behind the tests he performed at the accident scene).

We acknowledge that although Officer Farmer testified that he understood the physics behind a collision, he did not explain the scientific theory behind the speed formula that he used to calculate the critical speed of the curve and the speed of the Mitsubishi when it lost control and upon impact. We also observe that the defendant only made a general objection to Officer Farmer's qualifications at trial.  The defendant did not specifically question the reliability of any speed formula or Officer Farmer's understanding of the scientific theories behind the formula until this appeal.  Neither party asked Officer Farmer to explain the scientific basis for the formula.  We note, though, that Officer Farmer's testimony that the speed formula is from the Institute of Police Technology in Florida, appears in many accident reconstruction training manuals, and is in common use throughout the nation is probative on the formula's reliability.  His testimony that he checked his calculations made with the speed formula against radar measurements of actual speed also suggests that the formula is reliable.  As stated earlier, the record supports the trial court's finding Officer Farmer to be an accident reconstruction expert.  Absent specific objection by the defendant at trial, we will not fault

---

[3]We note that the supreme court has relieved this requirement for blood alcohol testing due to the demonstrated reliability of the machine performing the tests.  Sensing, 843 S.W.2d at 416.

the trial court for the admission into evidence of Officer Farmer's opinions about the speed of the Mitsubishi.

In any event, we believe that the defendant was not prejudiced by Officer Farmer's opinion on speed. The critical speed of the curve and the precise speed of the Mitsubishi as it entered the curve and upon impact are far from critical because several eyewitnesses testified that the Mitsubishi and the Camaro were speeding side by side down Fort Henry Drive, establishing that the cars were drag racing. The defendant's convictions stem from his participation in the drag race. Any error would be harmless.

## IV. ADMISSIBILITY OF THE COMPUTER-GENERATED VISUALIZATION

The defendant contends that the trial court should not have admitted the computerized visualization of the accident because it was unduly prejudicial, it served no non-cumulative evidentiary purpose, it was based upon the unqualified expert opinion of Officer Farmer, and it's depiction of the Camaro was purely speculative. The state contends that the trial court properly admitted the videotape as demonstrative evidence because it accurately depicted Officer Farmer's testimony, it's portrayal of the Camaro was based upon eyewitness testimony and physical evidence, and it was not unduly prejudicial.

The admissibility of a computer-generated depiction of a witness's testimony is an issue of first impression in this state. Generally, to be admissible, videotapes, like photographs, must be both relevant and a true and accurate portrayal of the recorded event or scene. Cohen, § 401.12 , at 112; see Tenn. R. Evid. 401, 901(a). Although authentic and relevant, the videotape may still be excluded if its probative value is substantially outweighed by its potential to prejudice the defendant unfairly or to confuse or mislead the jury. See Tenn. R. Evid. 403. The admissibility of a relevant and authentic videotape depicting a crime scene is within the trial court's sound discretion and will only be reversed based upon an abuse of that discretion. State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993).

A videotaped live-action reenactment "is illustrative evidence and is valid for consideration only to the extent that it illustrates facts otherwise shown by sworn testimony." Clark v. St. Thomas Hosp., 676 S.W.2d 347, 349 (Tenn. Ct. App. 1984). In Clark, the appellate court affirmed the trial court's admission of a videotape in which a hospital technician reenacted with a third party her testimony that she lowered the plaintiff to the floor when his knees buckled. The court noted that witnesses often reenact their testimony in front of the jury at trial, that the witness's sworn testimony remains the fundamental evidence for the jury's consideration, and that the plaintiff was able to cross-examine the technician. Id. at 349-50. However, we also note that due to its vivid realism, a videotape presenting one party's staged version of the facts presents the particular danger that the jury will confuse the reenactment with reality and that trial court will not be able to limit its effect with instructions. 2 John W. Strong, McCormick on Evidence § 214, at 19-20 (5th ed. 1999).

Other jurisdictions addressing the admissibility of a computer-generated videotape differ in their analysis based upon whether they view the videotape to be demonstrative evidence or a

scientific experiment or test. Courts and commentators make the distinction between a computer-generated animation, which illustrates a witness's testimony and is demonstrative evidence, and a computer simulation, in which one enters scientific or physical principles and data into a computer program and the program analyzes the data and draws a conclusion from it. Clark v. Cantrell, No. 25088, 2000 WL 282457, at *5 n.2 (S.C. Mar. 13, 2000); see Constans, et al., v. Choctaw Transport, Inc., et al., 712 So.2d 885, 901 (La. Ct. App. 1997) (distinguishing between an animation and a simulation). "In a simulation the computer functions in a sense as an expert itself, rendering its own opinion based on internal calculations of how the accident would have occurred." Constans, 712 So.2d at 901. Thus, courts "require proof of the validity of the scientific principles and data before admitting a simulation as evidence." Clark, No. 25088, 2000 WL 282457, at *5; see e.g., Commercial Union Ins. Co., et al., v. Boston Edison Co., 591 N.E.2d 165, 168 (Mass. 1992) (holding computer simulations to be admissible under the same standards as scientific tests); Richardson v. State Highway & Trans. Comm'n, 863 S.W.2d 876, 882 (Mo. 1993) (holding that the rules for the admissibility of experiments governs the admissibility of a Simulation Model of an Automobile Collision); Kudlacek v. Fiat S.p.A., 509 N.W.2d 603, 617 (Neb. 1994) (applying the three Commercial Union factors to a computer-generated videotape of a single-car accident); State v. Clark, 655 N.E.2d 795, 813 (Ohio Ct. App. 1995) (holding that the methodology underlying the expert's testimony regarding the computer-generated reconstruction of the shooting was sufficiently reliable based upon the three Commercial Union factors); Deffinbaugh v. Ohio Turnpike Comm'n, 588 N.E.2d 189, 193-94 (Ohio Ct. App. 1990) (using the standard for newly applied scientific principles for a computer simulation illustrating mechanical engineer's testimony that the tractor trailer jackknifed two hundred yards before striking a guardrail); 1 Michael H. Graham, Handbook of Federal Evidence § 401.7, at 224 (4th ed. 1996) (observing that in federal cases, computer-generated evidence going beyond illustration into experiment raises concerns about the reliability of the explanatory theory used); see also Bledsoe v. Salt River Valley Water Users Ass'n, 880 P.2d 689, 692 (Ariz. Ct. App. 1994) (analyzing a computer simulation of the plaintiff's bicycle colliding with a cable gate and holding that at a minimum, a simulation's proponent must show that the simulation is a fair and accurate depiction of what it represents and that the opponent had an opportunity to cross-examine and may also have to show the three Commercial Union factors). But see Pino v. Gauthier, 633 So.2d 638, 652 (La. Ct. App. 1993) (holding that computer-generated simulations are admissible on a case-by-case basis if they accurately depict what they claim to show; establish a fact of a party's case; aid in the jury's understanding; and do not unfairly prejudice, confuse, or mislead).

In Commercial Union Ins. Co., et al., v. Boston Edison Co., 591 N.E.2d 165 (Mass. 1992), the court examined the admissibility of a computer-generated simulation that calculated the amount of steam used by the plaintiffs over a five-year-period. It held that computer-generated simulations, like other scientific tests, are admissible if:

> (1) the computer is functioning properly;
> (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); and
> (3) the program is generally accepted by the appropriate community of scientists.

Id. at 168.  The Supreme Court of Nebraska applied the Commercial Union factors in affirming the trial court's admission of a computer-generated simulation of a car's path during an accident. Kudlacek v. Fiat S.p.A., 509 N.W.2d 603, 617 (Neb. 1994).  In Kudlacek, the expert entered the underlying data into the computer program, which created simulations of the accident.  The expert then compared the simulations to the physical evidence from the accident scene, the speed of the car, and testimony from witnesses to arrive at the simulation which best matched the available physical evidence.  Id. at 618.  The Ohio Court of Appeals applied the Commercial Union factors in affirming the admission of a reconstruction of a shooting based upon a computer-assisted drafting program. State v. Clark, 655 N.E.2d 795, 812-13 (Ohio Ct. App. 1995).  In Clark, the expert used a computer program to recreate the bathroom where the shooting occurred, then used the program to determine the location of the victim based upon the location of the gun at the time of the shooting.  By manipulating the positions of the victim and the gun, the expert was able to exclude the defendant's version of the events.  Id. at 810.  Thus, the expert used the computer program to recreate the crime scene so that he could test certain scenarios within it.  In both of these cases, the experts used the computer programs to arrive at the reconstruction rather than to illustrate a reconstruction they had already performed.

In Pino  v. Gauthier, 633 So.2d 638 (La. Ct. App. 1993), the Louisiana Court of Appeals parts company with the other jurisdictions treating computer simulations as novel scientific evidence.  The court analyzed a computer-generated simulation, in which a specialized program created four possible scenarios of how the defendant lost control of his vehicle while changing lanes. The court did not require proof on the reliability of the underlying computer program but instead applied the same standards of admissibility applied to videotapes generally in that jurisdiction.  Id. at 652.  Although it found that the simulation was relevant, the court affirmed the trial court's exclusion of the simulation as unduly prejudicial because it limited the opposing party's opportunity to present different scenarios based upon variables other than those depicted.  Id.  The court determined that it was "proper to avoid the impact of  the jury viewing the specially created tape, containing only favorable outcomes."  Id.  In McDaniel v. CSX Transport., Inc., 955 S.W.2d 257, 265 (Tenn. 1997), our supreme court held that Rules 702 and 703, Tenn. R. Evid., require proof that novel scientific evidence is reliable.  "Simply put, unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy . . . ."  Id.  Without deciding the admissibility of a videotape in which the computer created, rather than merely illustrated, the reconstruction, we believe at the very least that McDaniel would require proof of the reliability of the computer program in addition to showing relevance and probativeness that outweighs the potential prejudice.

Jurisdictions viewing the computer-generated videotape as merely illustrating the expert witness's testimony require only that the animation meet the rules of admissibility for demonstrative evidence and do not delve into the reliability of the underlying computer program.  See Pierce v. State, 718 So.2d 806, 809 (Fla. Dist. Ct. App. 1997) (holding that to be admissible as demonstrative evidence, a computer-generated animation must depict the opinion of a qualified expert relying upon facts reasonably relied upon by experts in that field and must be a fair and accurate representation of what it purports to be); Cleveland v. Bryant, et al., 512 S.E.2d 360, 362 (Ga. Ct. App. 1999) (holding that a computer-generated animation illustrating an accident reconstructionist's opinion of

how the accident occurred is admissible if it fairly and accurately represents the scene it seeks to depict); Hutchison v. American Family Mut. Ins. Co., 514 N.W.2d 882, 890 (Iowa 1994) (affirming the exclusion of a computer-generated depiction of a closed-head injury's effect on the brain because the authenticating expert did not see the accident or know the speeds or forces involved and, therefore, could not testify that the videotape correctly portrayed the plaintiff's injuries); State v. Harvey, 649 So.2d 783, 788 (La. Ct. App. 1995) (holding that computer-generated still animations of the shooting and the placement of the victim's body were probative as a visual demonstration of the pathologist's testimony); Constans, et al., v. Choctaw Transport, Inc., et al., 712 So.2d 885, 901 (La. Ct. App. 1997) (holding that a computer animation illustrating the accident reconstruction expert's opinion on the placement of the vehicles during the accident was not unduly prejudicial); People v. McHugh, 476 N.Y.S.2d 721, 722-23 (N.Y. Sup. Ct. 1984) (holding that a computer reenactment of a fatal car crash is admissible in a criminal trial if it is relevant to a possible defense, a fair and accurate reflection of the oral testimony, and aids the jury's understanding of an issue); Clark v. Cantrell, No. 25088, 2000 WL 282457, at *7-8 (S.C. Mar. 13, 2000) (holding that a computer-generated videotaped animation is admissible if authentic; relevant; a fair and accurate portrayal of the evidence to which it relates; and substantially more probative than prejudicial, confusing or misleading); Mintun v. State, 966 P.2d 954, 959 (Wyo. 1998) (holding that the state's computer-generated videotaped animation of a car accident was admissible because it was authentic, relevant, and not excluded by another rule); 1 Michael H. Graham, Handbook of Federal Evidence § 401.7, at 224 (4th ed. 1996) (noting that in federal cases, computer "animations are admissible provided a foundation of sufficient similarity is presented, subject to Rule 403"); see, e.g., Tillis Trucking Co. v. Moses, et al., 748 So.2d 874, 882 (Ala. 1999) (holding that a computer-generated animation of an accident used as a demonstrative aid did not conflict with the testimony at trial). But see Sommervold v. Grevlos, 518 N.W.2d 733, 738 (S.D. 1994) (applying a South Dakota statute requiring the party offering computer-generated evidence to describe the program used and show that it produced an accurate result to a computer animation illustrating an accident reconstructionist's testimony).

In this case, Professor Owen testified that the computer visualization depicted Officer Farmer's reconstruction of how the accident occurred. He explained that a computer simulation or reconstruction uses the laws of physics to recreate the exact event whereas a computer visualization converts an expert witness's testimony into something the jury can see. The defendant objected to the introduction of the videotape. The trial court stated that it would have to view the demonstrative evidence, meaning the videotape, out of the jury's presence. It overruled the objection, finding that the videotape was relevant, substantially helpful to the jury, sufficiently trustworthy to be admitted, and that its potential for prejudice did not outweigh its probative value. Before the jury watched the videotape, the court instructed:

> I caution you, this . . . would be taken like opinion evidence. In other words . . ., there was not a movie made at the time. You need to understand that this is something an expert has prepared and it would be considered, what you see will be in the nature of an opinion . . . .

Professor Owen testified that he created the visualization using photographs, measurements, and

calculations given to him by Officer Farmer; measurements of the road made by his team, which confirmed those made by Officer Farmer; and specifications on the vehicles involved obtained from contacts in the movie industry. He explained that he received all of the numbers regarding the speeds of the vehicles from Officer Farmer and did not make any computations himself. Thus, Professor Owen used the computer as a means to illustrate Officer Farmer's reconstruction of the accident and not to reconstruct the accident itself. We believe that the videotape is demonstrative evidence illustrating the testimony of Officer Farmer.

However, the trial court should not have admitted the visualization because it fails to meet the foundational requirement that it be a true and accurate portrayal of the accident it seeks to depict. See Tenn. R. Evid. 901(a). The visualization's depiction of the defendant's Camaro is speculative because Officer Farmer testified that he could not calculate the Camaro's speed because it left no yaw marks or skid marks at the scene. In fact, other than the photographs showing the Camaro was not damaged on the day after the accident, no evidence exists regarding the Camaro's path during the accident.

The state argues that the videotape's portrayal of the Camaro positioned in the left lane is supported by the testimony of three eyewitnesses who saw the cars racing down Fort Henry Drive and by the yaw marks left by the Mitsubishi, which begin on the railroad bridge in the right lane. It contends that the relative speed of the two cars is supported by eyewitness testimony that the cars were traveling side by side and by Officer Farmer's calculation of the critical speed of the curve. Finally, it claims that the Camaro's position entering the curve is supported by the absence of any skid marks from the Camaro and the fact that the Camaro made it through the curve unscathed as revealed by photographs of the car taken the next day.

On cross-examination, Professor Owen testified that based on the fact that the undamaged Camaro could not have occupied the same space as the Mitsubishi or the minivan at the same time, the accident had to have happened either behind the Camaro as depicted in the visualization or in front of the Camaro. The fact that these two possibilities exist coupled with the lack of physical evidence from the Camaro at the scene and witnesses to the accident itself make the visualization's portrayal of the Camaro's actions speculative. The trial court erred in admitting the visualization because no evidence exists that its portrayal of the actions of the Camaro are a true and accurate depiction of the events in question, although it shows the Camaro going at a particular rate of speed. We turn again to the warning regarding videotapes showing one party's staged reproduction of the disputed facts that:

> the extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. For not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit . . . by judicial instruction.

McCormick, § 214, at 19-20. The speculative nature of the visualization, coupled with the particular dangers of the videotape medium, cause the dangers of unfair prejudice to the defendant and of misleading the jury to outweigh the videotape's probative value. See Tenn R. Evid. 403.

Nevertheless, we believe that the admission of the videotape was harmless because, considering the record as a whole, we cannot conclude that the error more probably than not affected the judgment. T.R.A.P. 36 (b). Eyewitness testimony established that the defendant was drag racing with Mr. Baker on Fort Henry Drive to the railroad bridge immediately preceding the curve where the accident occurred. The defendant's responsibility for the deaths of Mr. Baker and Mr. Bostrum and the injuries to Ms. Gilliam and Ms. Redwine stems from his participation in the drag race with Mr. Baker. The precise speeds of the Camaro and the Mitsubishi in the curve, as well as the position of the Camaro relative to the accident in the time frame covered by the videotape, are largely irrelevant.

Presumably to show that he was prejudiced by the visualization's depiction of the Camaro, the defendant contends that the visualization is but one piece of circumstantial evidence. The defendant notes that when a conviction is based exclusively upon circumstantial evidence, the evidence must exclude every other reasonable hypothesis except that of the defendant's guilt. See State v. Adams, 916 S.W.2d 471, 476 (Tenn. Crim. App. 1995). He argues that the state failed to meet its burden of proof for convictions based upon circumstantial evidence because it has not excluded every other reasonable hypothesis such as that of the Camaro substantially reducing its speed as it went into the curve. Although we believe this argument to be more akin to a claim that the evidence is insufficient,[4] it is nonetheless without merit because the defendant's convictions are not based exclusively upon circumstantial evidence.

## V. INSTRUCTION ON FLIGHT

The defendant contends that the trial court erred by instructing the jury on flight. He argues that the evidence shows only that he left the scene of the accident, a circumstance which is insufficient to support a flight instruction. The state contends that the trial court properly instructed the jury on flight as follows:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.
> The law makes no precise definition as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a

---

[4]The defendant raises the sufficiency of the evidence in the section of his brief entitled Issues Presented for Review, but no portion of his Law and Argument section is devoted to this issue. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. R. Crim. P. 10(b). We decline to guess whether the defendant meant to segue into the sufficiency of the evidence for each of his convictions by contending that the computer visualization was circumstantial evidence. In any event, he still fails to explain how the evidence is insufficient.

concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, . . . the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if the flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

It is well-settled that the fact that a defendant fled "from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt." State v. Williams, 638 S.W.2d 417, 421 (Tenn. Crim. App. 1982). However, in State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986), the court held that it is improper to instruct a jury on flight if no evidence exists to support it other than the fact that the defendant left the scene. The court held that flight requires both a leaving of the scene and a subsequent hiding out, evasion, concealment in the community, or leaving of the community.

The defendant contends that the instruction on flight was not warranted because the evidence shows only that he left the scene after the accident and that no evidence existed that he hid out or otherwise tried to evade the police. He further argues that he surrendered to the police. At trial, Tracy Shipley testified that he came upon the accident almost immediately after it occurred and saw a red Camaro return to the crash scene. He saw someone jump out of the Camaro and jump back inside. The Camaro then turned around and drove away from the accident at a high rate of speed. Detective Ralph Kline testified that he spent the rest of the night of March 20 and the early morning of March 21 unsuccessfully trying to locate the defendant, including checking the defendant's residence. We hold that these facts support an instruction on flight. The fact that the defendant later surrendered does not diminish the fact that he earlier left the scene and concealed himself such that he could not be found by the authorities.

## VI. SENTENCING

The defendant contends that the trial court erred in sentencing. Specifically, he argues that it erred by applying certain enhancement factors, by imposing consecutive sentences, and by denying a sentence alternative to straight incarceration. The state contends that the trial court properly sentenced the defendant.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing

Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating
>
> and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class E felony is presumptively the minimum in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169. The law provides no presumptive minimum for misdemeanor sentencing. See e.g., State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994). However, in misdemeanor sentencing, the trial court must consider the purposes and principles of the Criminal Sentencing Reform Act of 1989. Tenn. Code Ann. § 40-35-302(d).

At the sentencing hearing, the state introduced a certified copy of a conviction the defendant received in Virginia for driving while intoxicated. The offense occurred on May 13, 1997, and the conviction was entered on July 18, 1997. The state also introduced into evidence the defendant's convictions in Tennessee for the October 1997 offenses of underage consumption, driving on a revoked license, and possession of a schedule IV narcotic. The affidavit of complaint regarding the October offenses was read into evidence. In the affidavit, an officer reported seeing the defendant drive erratically and pull into the path of another vehicle, narrowly avoiding collision. When the defendant stopped at a convenience store, the officer noticed an odor of alcohol on his person. The officer patted down the defendant for safety and found a prescription bottle, which the defendant tried to hide. The defendant removed the bottle from his pocket and threw it against the store. Testing of the contents of the bottle revealed schedule IV narcotics.

A presentence report was introduced into evidence. The report shows that the defendant was twenty-one years old at the time of sentencing. It reflects the previously mentioned convictions, as well as two 1995 convictions for speeding. The report reflects that in the ninth grade, the defendant was placed in an alternative school for disciplinary problems but was suspended from the alternative school after two weeks. The defendant then became a homebound student but quit school due to a lack of interest. The defendant has since worked for his father's shoe repair business. The defendant reported good physical health. He stated that he began drinking alcohol socially at age seventeen. He said that he drank heavily between March and October 1997 but that he has since been spending time with friends who do not drink. He admitted using Xanax and marijuana in the past and reported his last drug use to be in October 1997. The defendant's mother reported that the defendant has been attending informal counseling with his pastor every week. The presentence report also reflects statements from the deceased victims' families explaining the devastating impact of the victims' deaths on their lives.

The trial court sentenced the defendant as a Range I, standard offender to two years for each conviction. It applied enhancement factors (1) and (2), that the defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the range and that he was a leader in the commission of an offense involving two or more criminal actors, to all offenses. Tenn. Code Ann. § 40-35-114(1), (2). For the reckless endangerment convictions, the trial court applied factor (6), that the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victims was particularly great. Tenn. Code Ann. § 40-35-114(6). In mitigation, the trial court refused to consider the defendant's youth at the time of the offense under mitigating factor (6) due to his exposure to the juvenile justice system but did consider the defendant's youth under mitigating factor (13), giving it little weight. Tenn. Code Ann. § 40-35-113(6), (13). The trial court ordered the defendant's sentences to run consecutively, finding that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and who has no hesitation about committing a crime when the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). In denying an alternative sentence, the trial court considered the circumstances of the offense, the defendant's drug use and social history, and his criminal record. Tenn. Code Ann. § 40-35-103(1)(A). The trial court also considered the defendant's "pattern of abuse of an automobile on the public highways of this state and other states," and determined that

an alternative sentence would not be in the best interest of the public and would diminish the seriousness of the offenses. Tenn. Code Ann. § 40-35-103(1)(B).

## A. Enhancement Factors

The defendant contends that the trial court erred by applying enhancement factors (2) and (6). With respect to factor (2), that the defendant was a leader in an offense involving two or more criminal actors, the defendant contends that the trial court erred because he was the only convicted criminal actor. The state contends that the factor does not require that the other criminal actors be charged, much less convicted. It argues that the factor merely requires that there be other criminal actors and that the defendant be a leader.

Factor (2) provides for enhancement when the defendant is "a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). With respect to the criminally negligent homicide of Mr. Bostrum, Mr. Baker was a criminal actor in that he engaged in criminally negligent conduct which resulted in Mr. Bostrum's death. By inviting Mr. Baker to join him in the conduct that eventually resulted in that death, the defendant was a leader in the commission of the criminally negligent homicide of Mr. Bostrum. We do not believe, however, that Mr. Baker was a criminal actor with respect to his own death. In this respect, we cannot say that factor (2) applies to the defendant's conviction for the criminally negligent homicide of Mr. Baker. Nevertheless, we do not believe that the trial court's misapplication of this factor justifies a reduced sentence, considering the other enhancement factors.

We believe that the trial court properly applied factor (2) to both reckless endangerment convictions. Mr. Baker was a criminal actor by engaging in conduct that placed Ms. Gilliam and Ms. Redwine in danger of imminent death or serious bodily injury. By orchestrating the events, the defendant was the leader of that conduct. The fact that the defendant was the only person convicted does not render the factor inapplicable, as the plain language of the statute requires only another criminal actor. The evidence is sufficient to support the trial court's finding that the defendant was a leader in an offense involving two or more criminal actors.

The defendant contends that the trial court erred by applying factor (6), that the victims sustained particularly great personal injuries or property damage, to his felony reckless endangerment convictions. He argues that this factor is inapplicable because his car never made contact with the Gilliam and Redwine vehicles. The state contends that the trial court properly applied the enhancement factor. We agree. The defendant's reckless endangerment convictions are the result of his engaging in drag racing, conduct "which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). Thus, reckless endangerment can occur although no contact is made and no one suffers injury. See State v. Ramsey, 903 S.W.2d 709, 712 (Tenn. Crim. App. 1995). As a result of the defendant's reckless conduct, Ms. Gilliam and Ms. Redwine suffered particularly great personal injuries and property damage. Ms. Gilliam suffered a broken left leg, a crushed right leg, broken toes, a broken foot, and a broken elbow. She was hospitalized for three weeks. Ms. Redwine suffered glass lacerations on her head,

hand, and left arm. She suffered burns on her chin and face and was bruised on her left side. Both vehicles were severely damaged. Because the defendant engaged in conduct that placed the victims in imminent danger of death or serious bodily injury, the victims' resulting injuries are attributable, at least in part, to him, regardless of whether their cars made contact.

## B. Consecutive Sentences

The defendant contends that the trial court erred by imposing consecutive sentences. He argues that the evidence does not support a finding that he is a dangerous offender from whom society needs protection. He argues that his youth and his current life and work history support concurrent sentencing. The state contends that the record supports the trial court's finding that the defendant is essentially a menace to society when he is driving.

A trial court may impose consecutive sentences when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(4). In addition, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity

of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

In finding the defendant to be a dangerous offender, the trial court considered the defendant's speeding tickets before the offense, the circumstances of the offense, and the defendant's conduct after the offense. The trial court determined that the defendant's conduct, demonstrating a pattern of irresponsible operation of a vehicle, warranted a dangerous offender finding. It determined that the sentences reasonably related to the severity of the offenses and that a long period of incarceration was necessary to protect the public.

The defendant has not shown that the trial court's imposition of consecutive sentences was improper. As the trial court determined, the defendant, although young, has displayed a pattern of irresponsible and reckless driving showing his disregard for the driving laws of this state before, during, and after the commission of the present offenses. Of particular concern is the defendant's apparent inability to recognize the seriousness of his conduct. After the present offenses, the defendant continued his dangerous and reckless behavior by driving while intoxicated and driving on a revoked license after illegally consuming alcohol. The record supports the trial court's findings that the defendant is a dangerous offender and that consecutive sentences reasonably relate to the severity of the offenses and are necessary to protect the public.

## C. Alternative Sentencing

In his statement of the issues, the defendant contends that the trial court erred by denying a sentence alternative to straight confinement. However, in the argument section of his brief, the defendant merely states that he is presumed to be a favorable candidate for alternative sentencing.

See Tenn. Code Ann. § 40-35-102(6) (defendants convicted of Class E felonies are presumed to be favorable candidates for alternative sentencing absent evidence to the contrary). The defendant does not explain how the trial court erred and makes no citation to the record or to authority. Under these circumstances, we view the issue to be waived. See T.R.A.P. 27(a)(7). Nevertheless, we have reviewed the record and conclude that the trial court properly denied alternative sentencing based upon the circumstances of the offense, the defendant's criminal record, his drug use, his social history, and his "pattern of abuse of an automobile on the public highways of this state and other states[.]" The record supports the trial court's determination that an alternative sentence would not be in the best interest of the public and would diminish the seriousness of the offense. Tenn. Code Ann. § 40-35-103(1)(A), (B).

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the defendant's convictions of criminally negligent homicide, drag racing, and leaving the scene of an accident involving death or injury. We merge the finding of guilt for the reckless endangerment of Ms. Redwine, count four, into the conviction for the reckless endangerment of Ms. Gilliam, count three. The judgment of

conviction for count four is vacated, and the defendant's effective sentence is modified to six years in the Department of Correction and fines totaling ten thousand dollars.